**COMMONWEALTH of Pennsylvania,
Appellee**

v.

**Richard Roland LAIRD, Appellant.**

Supreme Court of Pennsylvania.

Submitted Nov. 7, 2014.

Decided July 20, 2015.

-

Elizabeth Hadayia, Esq., Federal Community Defender Office, Capitol Habeas Unit, for Richard Roland Laird.

Jill Marie Graziano, Esq., Michelle Ann Henry, Esq., Doylestown, Amy Zapp, Esq., PA Office of Attorney General, for Commonwealth of Pennsylvania.

SAYLOR, C.J., EAKIN, BAER, TODD, STEVENS, JJ.

### *OPINION*

Chief Justice SAYLOR.

This capital post-conviction appeal relates to Appellant's killing of Anthony Milano in 1987. The underlying facts are described in *Commonwealth v. Chester,* 526 Pa. 578, 587 A.2d 1367 (1991), and *Commonwealth v. Laird,* 605 Pa. 137, 988 A.2d 618 (2010).

Briefly, on the night of December 14, 1987, Milano drove to the Edgely Inn in Bristol Township, a bar where Appellant

and his friend Frank Chester were drinking. Milano, Chester, and Appellant conversed and drank alcohol until the early morning hours of December 15. Witnesses testified that, during this time, Appellant seemed coherent, was able to walk without swaying or stumbling, and was not slurring his speech. At some point, Appellant and Chester began taunting Milano because they thought he might be homosexual. In spite of the taunting, Milano agreed to give Appellant and Chester a ride home. Traveling in Milano's car, they eventually proceeded to a wooded area, stopped along the side of the road, and exited the vehicle. Chester struck Milano, causing him to fall to the ground. Appellant pinned Milano down and killed him by slashing his throat repeatedly with a boxcutter. Appellant and Chester ran to the home of a friend, Rich Griscavage. On arriving at Griscavage's residence, Chester said they had gotten into a fight and "the dude is dead." Appellant told Chester to "shut up." Griscavage gave Appellant a ride home on his motorcycle. He testified that Appellant had no trouble keeping his balance or leaning into turns.

Later that day (December 15, 1987), Appellant's girlfriend observed Appellant place his blood-covered keychain and clothing into a plastic bag, which he discarded in a dumpster in a nearby town. She testified that Appellant disposed of the box cutter by throwing it into a creek, and, additionally, asked her if she could "be an alibi." That evening, Milano's car was found engulfed in flames, and the fire marshal testified that, in his opinion, the fire was deliberately set. Milano's body was found near the car.

The Commonwealth introduced a recording and transcript of a phone call between Chester and Appellant that occurred five days after the killing, the interception of which was approved by Chester. During the call, Appellant: suggested that Chester leave town; indicated his intention to "hide until this blows over;" recommended ways of passing a polygraph test; commented on the district attorney's inability to prove a case without evidence; and expressed a belief that criminal homicide is subject to a seven-year statute of limitations. *See Laird,* 605 Pa. at 150–52, 988 A.2d at 625–26; *Chester,* 526 Pa. at 586–89, 587 A.2d at 1371–72.

Appellant and Chester were tried together in May 1988. Each testified and admitted he was present at the crime scene, but blamed the other for the killing. Both defendants were convicted of first-degree murder, kidnapping, aggravated assault, and related offenses. Both were sentenced to death. This Court affirmed the judgments of sentence. *See Chester,* 526 Pa. at 615, 587 A.2d at 1385.

Appellant filed a timely petition under the Post Conviction Relief Act, 42 Pa.C.S. §§ 9541–9546 ("PCRA"), which was denied. *See Commonwealth v. Laird,* 555 Pa. 629, 726 A.2d 346 (1999). The federal district court granted in part Appellant's subsequent petition for habeas relief, vacating his first-degree murder conviction and death sentence. *See Laird v. Horn,* 159 F.Supp.2d 58 (E.D.Pa.2001), *aff'd,* 414 F.3d 419 (3d Cir.2005). With Appellant's conviction for, *inter alia,* kidnapping still in place, the Commonwealth retried him on the first-degree murder charge in February 2007.

At his retrial, Appellant was represented by attorneys John Kerrigan and Keith Williams, with the former having a leading role in the guilt phase and the latter primarily responsible for the penalty phase. For his guilt-phase strategy, Appellant stipulated that he participated in murdering Milano, but not that he acted with specific intent. Thus, the only question for

the jury was whether Appellant acted with a specific intent to kill so as to make him guilty of first-degree murder. As to this issue, Appellant advanced a diminished-capacity defense, which negates specific intent so as to mitigate first-degree murder to third-degree murder. *See Commonwealth v. Hutchinson*, 611 Pa. 280, 341, 25 A.3d 277, 312 (2011). To support the defense, Appellant presented the testimony of multiple experts who indicated that Appellant had a high blood-alcohol content ("BAC") at the time of the killing and that this, together with brain damage resulting from head injuries sustained during Appellant's life, impeded Appellant from forming the requisite intent to kill. The experts also developed that, given the amount of alcohol Appellant ingested prior to the killing, he may have been acting in an "alcoholic blackout," where he could function normally but later have no recall of the time period in question. Two of the experts related that Appellant told them shortly before the retrial that he had no memory of the killing. *See Laird*, 605 Pa. at 148, 988 A.2d at 624.

The defense was unsuccessful, however, as the jury convicted Appellant of first-degree murder. In the penalty phase, Appellant again received the death penalty when the jury determined that the only aggravating factor it found—the circumstance pertaining to a killing committed while in the perpetration of a felony (here, kidnapping), *see* 42 Pa.C.S. § 9711(d)(6)—outweighed the mitigating circumstances

found by one or more jurors pursuant to the "catchall" mitigator, *see id.* § 9711(e)(8) (relating to "[a]ny other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense").[1] This Court affirmed the judgment of sentence on direct appeal. *See Laird*, 605 Pa. at 186, 988 A.2d at 648.

Appellant filed a counseled, amended PCRA petition, raising thirteen claims. The PCRA court, per Judge Boylan (who also presided over Appellant's retrial), dismissed two claims without a hearing.[2] The court thereafter conducted an evidentiary hearing on the remaining claims on May 23, May 24, and June 19, 2012, at which a number of witnesses testified, including Attorneys Kerrigan and Williams. The PCRA court denied relief by two orders dated August 7, 2013.[3] After Appellant filed a notice of appeal, the court issued an opinion pursuant to Rule 1925(a), Pa. R.A.P., addressing each of the allegations of error reflected in the notice of appeal and concluding that it had properly denied the petition. *See Commonwealth v. Laird*, No 1988–746, *slip op.* 2014 WL 8734830 (C.P. Bucks April 10, 2014) ("PCRA Ct. Op. II").

■ To be eligible for relief, a PCRA petitioner must establish by a preponderance of the evidence that his conviction or sentence resulted from one of the circumstances enumerated in Section 9543(a)(2) of the PCRA, 42 Pa.C.S. § 9543(a)(2), and

---

**1.** The specific (e)(8) mitigating factors found by the juror(s) are discussed below. *See infra* note 16 and associated text.

**2.** The claims pertained to allegations that counsel failed to life-qualify the jury and that the jurors were exposed to extraneous influences. Appellant does not challenge these dismissals on appeal.

**3.** The first order was accompanied by an opinion and only related to Claim V(B) of the

petition, which asserted that trial counsel erred by failing to introduce medical records and police reports to support the diminished capacity defense. *See Commonwealth v. Laird*, No. 1988–746, *slip op. & order*, 2013 WL 10545879 (C.P. Bucks Aug. 7, 2013) ("PCRA Ct. Op. I"). The second order summarily denied relief on the petition as a whole.

that the allegation of error has not been previously litigated or waived. *See Commonwealth v. Baumhammers*, 625 Pa. 354, 364–65, 92 A.3d 708, 714 (2014) (citing *Commonwealth v. Sneed*, 616 Pa. 1, 16–17 & n. 13, 45 A.3d 1096, 1105 & n. 13 (2012)). Because all the claims Appellant presently raises relate to an alleged deprivation of the Sixth Amendment right to competent counsel, *see McMann v. Richardson*, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 1449 n. 14, 25 L.Ed.2d 763 (1970), he may only prevail if he pleads and proves that his conviction or sentence resulted from ineffective assistance of counsel that, under the circumstances, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have occurred. *See* 42 Pa.C.S. § 9543(a)(2)(ii); *Commonwealth v. King*, 618 Pa. 405, 415, 57 A.3d 607, 613 (2012).

■ Pennsylvania's test for ineffectiveness is the same as the two-part performance-and-prejudice standard set forth by the United States Supreme Court, *see Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), albeit this Court has divided the performance element into two sub-parts dealing with arguable merit and reasonable strategy. *See Commonwealth v. Washington*, 592 Pa. 698, 713 n. 8, 927 A.2d 586, 594 n. 8 (2007). Therefore, to succeed on an ineffectiveness claim, a petitioner must demonstrate that: the underlying claim is of arguable merit; counsel had no reasonable basis for the act or omission in question; and he suffered prejudice as a result, *i.e.*, there is a reasonable probability that, but for counsel's error, the outcome of the proceeding would have been different. *See Commonwealth v. Harris*, 578 Pa. 377, 387, 852 A.2d 1168,

1173 (2004) (citing *Commonwealth v. Pierce*, 567 Pa. 186, 203, 786 A.2d 203, 213 (2001)). A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *See King*, 618 Pa. at 416, 57 A.3d at 613 (citing *Commonwealth v. Ali*, 608 Pa. 71, 86–87, 10 A.3d 282, 291 (2010)). *See generally Commonwealth v. Kimball*, 555 Pa. 299, 311–13, 724 A.2d 326, 332–33 (1999) (developing that the PCRA test for prejudice is identical to that of *Strickland*).

Appellant forwards multiple ineffectiveness claims as well as a contention that he should be afforded relief based on the cumulative effect of counsel's alleged errors. For convenience, Appellant's claims have been reordered below according to the chronology of events surrounding his retrial. Details of the retrial and post-conviction proceedings will be set forth as necessary to resolve each claim.[4]

### Failure to renew change-of-venue motion

■ Appellant's first claim is based on an allegation that there was excessive publicity about the crime during the timeframe leading up to his retrial, and that this publicity prejudiced the jury against him. Appellant faults counsel for failing to renew an earlier motion for a change of venue immediately before, or during, jury selection.

A hearing on pretrial motions was held on October 30, 2006, three months before jury selection. In support of a venue-change motion, counsel explained that certain news articles concerning the upcoming trial described Appellant as having been "previously convicted" of murder as opposed to simply "accused," as would be the norm for a first trial. Counsel argued that

---

4. In reviewing an order denying a PCRA petition, we consider whether the evidence of record supports the PCRA court's ruling and whether that ruling is free from legal error. *See Commonwealth v. Halley*, 582 Pa. 164, 169 n. 2, 870 A.2d 795, 799 n. 2 (2005).

the publicity was especially damaging because certain advocacy groups were promoting the view that Appellant was motivated to kill Milano by his perception of Milano's sexual orientation. The Commonwealth responded that the publicity was not excessive and the mere existence of some pretrial publicity did not justify a change of venue. The common pleas court denied the motion but stated that counsel would be permitted to renew it and place any supporting evidence into the record at *voir dire.* To minimize any further exposure counsel and the Commonwealth entered into an agreement—which the court approved by order issued from the bench—that neither side would speak publicly about the case before trial. When jury selection began in late January 2007, counsel did not renew the motion.

Appellant argues that, between the October 2006 denial of the motion and the conclusion of *voir dire* on January 31, 2007, several articles appeared in the local Bucks County *Courier Times.* He observes that counsel placed two of these articles into the record during jury selection in the context of a motion to strike a prospective juror for cause. The first article, dated January 28, 2007 (one day before jury selection began) appeared on the front page of the newspaper and carried the headline, "Convicted killer back in court." *See* Petitioner's PCRA Exhibits, Vol. I, at 303; *see also* N.T., Jan. 29, 2007, at 290–322 (containing the *voir dire* examination and strike for cause of a prospective juror who had read the January 28 article). Appellant argues that this article was damaging because it discussed his prior convic-

tion and death sentence, as well as related information about the case from which prospective jurors should be shielded. The second newspaper story, entitled, "Jury selection begins in Laird retrial," was published on January 30, 2007, the second day of jury selection. *See* Petitioner's PCRA Exhibits, Vol. I, at 305; *see also* N.T., Jan. 31, 2007, at 190–214 (reflecting the *voir dire* examination and peremptory strike of a prospective juror who had read the January 30 article). Appellant suggests that he was prejudiced by this article because the word "retrial" appeared in the headline.

Overall, Appellant maintains that 22 panelists admitted having some knowledge about the case and that, of those, thirteen knew that Appellant was previously convicted of murder and had received the death penalty. Appellant points to several instances in which a prospective juror, on individual questioning, expressed knowledge of the facts of the case or an opinion as to Appellant's guilt. Appellant also notes that one of the selected jurors, Juror 12, was the co-worker of a person who attended high school with Appellant and who had recently read an article about the case. In this regard, Appellant observes that Juror 12 stated he had spoken with his co-worker the previous day and that the co-worker described the case as "gruesome."[5] Appellant contends, based on the foregoing, that trial counsel erred in not renewing the motion for a change of venue. He maintains that he was presumptively prejudiced by having his case tried to a Bucks County jury under the circumstances. In the alternative, Appellant con-

5. Appellant also claims that the co-worker spoke about Appellant in a " 'less-than-flattering' manner." Brief for Appellant at 74 (quoting N.T., Jan. 31, 2007, at 67). However, the transcript reflects that the juror only stated that his co-worker "was less than flattering" about the crime in view of its "grue-

some" quality, rather than about Appellant. N.T., Jan. 31, 2007, at 66–67. Notably, Juror 12 specifically denied that his co-worker said anything negative about Appellant. *See id.* at 67. Additionally, Juror 12 testified that he had not himself seen any information about the case. *See id.* at 66.

tends he suffered actual prejudice because the jury that was seated was not fair and impartial.[6]

The Commonwealth responds that the question is not whether jurors exposed to media reports had some knowledge of the crime, but whether they were able to set aside any impressions or preliminary opinions they may have formed and render a verdict based only on the evidence presented at trial. It highlights that the two newspaper articles mentioned above are the only media stories of record. *See* Brief for the Commonwealth at 93 & n.11. The Commonwealth notes, moreover, that in the three days of jury selection, only a fraction of the 160 panelists stated they had any familiarity with the case, and virtually all of them were stricken, either for cause or via peremptory challenges. The Commonwealth adds that only a single individual—Juror 12—was seated who had indicated any familiarity with the case, and that such familiarity was limited to a suggestion by his co-worker that the underlying facts were "gruesome." Further, the Commonwealth observes that Juror 12 testified he would put aside what his co-worker said and rely solely on the trial evidence and the court's instructions. As such, the Commonwealth argues that Appellant's claim lacks arguable merit, counsel acted reasonably in not renewing the motion to change venue, and Appellant has not established a basis to presume prejudice or find actual prejudice.

In rejecting this claim, the PCRA court recounted that it had dismissed all prospective jurors who knew the case was a retrial. *See* PCRA Ct. Op. II, *slip op.* at 10. The court also recited that Attorney Kerrigan had testified at the PCRA hearing that he would have renewed the motion for a change of venue if it appeared at jury selection that the publicity had been overwhelming, *see id.* at 11 (quoting N.T., May 23, 2012, at 106–07), and that Attorney Williams testified that, at the conclusion of jury selection, he and Mr. Kerrigan were "ready to go forward" and believed a venue-change motion at that juncture would have been a "waste of time." *See id.* (quoting N.T., May 23, 2012, at 144). Ultimately, the PCRA court concluded that: the venire panelists' knowledge of the case was "limited;" the community was not "saturated" with publicity; and it would have denied a renewed change-of-venue motion in any event because the court "would have had no basis to grant such a motion." *Id.* at 13.

A change of venue is necessary when the court determines that a fair and impartial jury cannot be selected in the county where the crime took place. *See Commonwealth v. Karenbauer*, 552 Pa. 420, 433, 715 A.2d 1086, 1092 (1998). "[T]he trial court is in the best position to assess the atmosphere of the community and to judge the necessity of any requested change." *Commonwealth v. Briggs*, 608 Pa. 430, 466, 12 A.3d 291, 313 (2011) (internal quotation marks omitted). The existence of pretrial publicity does not alone justify a presumption of prejudice, but prejudice will be assumed where the defendant shows that the publicity: was sensational, inflammatory, and slanted toward conviction, rather than factual or ob-

---

**6.** In the present context, the allegations relating to prejudice are an essential part of the arguable-merit prong of the ineffectiveness test. This is because the viability of any claim that counsel's stewardship was deficient rests on the premise that Appellant was prejudiced—or that counsel should have known he would be prejudiced—by counsel's failure to renew the change-of-venue motion. *Cf. Baumhammers*, 625 Pa. at 382–83, 92 A.3d at 725 (explaining that the arguable-merit and prejudice prongs overlap in the context of an argument that counsel was ineffective for failing to call a witness).

jective; revealed the defendant's prior criminal record (if any) or referred to confessions, admissions, or reenactments of the crime by the defendant; or was derived from official police and prosecutorial reports. *See Karenbauer*, 552 Pa. at 434, 715 A.2d at 1092; *Commonwealth v. Tharp*, 574 Pa. 202, 219 830 A.2d 519, 529 (Pa.2003). Even if the accused proves one of these factors, a change of venue is not required unless he also shows, *inter alia*, that the pretrial publicity was so extensive, sustained, and pervasive that the community must be deemed to have been saturated with it. *See Karenbauer*, 552 Pa. at 434, 715 A.2d at 1092.

Here, in arguing for a finding of presumed or actual prejudice, Appellant primarily refers to the two newspaper stories of record which appeared shortly before or during jury selection. We do not find these articles to be materially sensational, inflammatory, or slanted toward conviction.[7] Indeed, the only *Karenbauer* factor that these stories implicate is that they reveal Appellant's prior criminal record in that they state he had been convicted and sentenced to death previously, and that the then-impending proceeding would be a retrial necessitated by the federal courts' decision to vacate his first-degree murder conviction and death sentence. Although Appellant correctly notes that trial counsel were concerned about such publicity, any such concerns were allayed when it emerged during jury selection that only a small portion of the venire had been exposed to these media stories, and anyone who knew that Appellant was being retried would be excluded from the jury. The only seated juror who had learned anything stemming from the media had only

heard a second-hand generalized description of the nature of the crime itself and nothing material about Appellant.

The United States Supreme Court has explained that jurors need not "be totally ignorant of the facts and issues involved" in an upcoming trial, *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961), *quoted in Commonwealth v. Robinson*, 581 Pa. 154, 197 n. 36, 864 A.2d 460, 485 n. 36 (2004), and that a presumption of prejudice "attends only the extreme case." *Skilling v. United States*, 561 U.S. 358, 381, 130 S.Ct. 2896, 2915, 177 L.Ed.2d 619 (2010). The record before us does not suggest that pretrial publicity in this case was extreme or that the community must be deemed to have been saturated with it. Only two articles of record were disseminated in the media shortly before Appellant's retrial, and only a comparatively small portion of the venirepersons indicated an awareness of them. Thus, Appellant's assertion that prejudice should be presumed cannot be supported. *Cf. Karenbauer*, 552 Pa. at 434, 715 A.2d at 1093 (rejecting a presumed-prejudice argument where the appellant made a "bald assertion that the pretrial publicity in th[e] case was extensive").

Any contention that actual prejudice occurred—or, more accurately in view of the ineffectiveness overlay, that counsel should have been aware that actual prejudice was likely to ensue—depends on the predicate that the individuals selected to serve as jurors would have been unable, in view of the pretrial publicity, to "set aside their impressions or preliminary opinions and render a verdict solely based on the evidence presented to them at trial." *Briggs*, 608 Pa. at 467, 12 A.3d at 314 (citing

---

7. One of the articles contains a sensationalized sentence in that it quotes an unnamed prosecutor as stating that whoever perpetrated the crime "slic[ed] Milano up like a cheap piece of tenderloin." Petitioner's PCRA Exhibits, Vol. I, at 304. However, the remainder of the story is factual in nature.

*Commonwealth v. Tressler*, 526 Pa. 139, 145 n. 6, 584 A.2d 930, 933 n. 6 (1990); *Commonwealth v. Hoss*, 469 Pa. 195, 200–01, 364 A.2d 1335, 1338 (1976)). Besides Juror 12, however, the ability to set aside preliminary opinions derived from the media was not an issue since there is no record basis to believe that the other seated jurors were exposed to the newspaper articles in question. As for Juror 12, his exposure was limited to having heard that the case involved "gruesome" facts, *see* N.T., Jan. 31, 2007, at 71, a description that was not substantially at issue. *See, e.g., id.* at 72 (reflecting that, in ascertaining whether Juror 12 would be capable of listening to the Commonwealth's evidence without compromising his ability to be fair and impartial, Attorney Kerrigan explained that "this case involves a very horrible, brutal killing"). Additionally, Juror 12 testified during *voir dire* that he did not form any preconceived ideas about Appellant's guilt or innocence, and that he would refrain from speaking any further to his co-worker about the case. *See* N.T., Jan. 31, 2007, at 68, 71.

The PCRA court credited such testimony as it concluded that Appellant "can demonstrate no partiality of any juror." PCRA Ct. Op. II, *slip op.* at 10. We find this conclusion to be supported by the record, including the extensive *voir dire* transcripts and related exhibits, and consistent with precedent. *See, e.g., Briggs*, 608 Pa. at 471–74, 12 A.3d at 316–18 (affirming the denial of a motion for a change of venue where eight seated jurors had read about the case in the media, six of those eight had forgotten about it by the time they were summoned for jury duty, and none of the eight indicated that their exposure would interfere with their ability to render a verdict based solely on the trial evidence).

Accordingly, since Appellant has not demonstrated a basis to presume prejudice or find actual prejudice, the underlying claim lacks arguable merit.[8] That being the case, relief is unavailable on the present ineffectiveness contention. *See generally Commonwealth v. Keaton*, 615 Pa. 675, 693, 45 A.3d 1050, 1061 (2012) ("Failure to establish any prong of the [ineffectiveness] test will defeat an ineffectiveness claim.").

### *Failure to impeach Commonwealth witnesses* [9]

■ Next, Appellant maintains that his guilt-phase counsel, Attorney Kerrigan, rendered ineffective assistance in cross-examining several witnesses concerning Appellant's alcohol consumption. Although counsel did, through cross-examination, bring to light that Appellant had consumed alcoholic beverages during the relevant timeframe, Appellant proffers that there were ways counsel could have more skillfully handled these witnesses so as to portray an even higher level of intoxication and thereby make his diminished-capacity defense more likely to prevail.

Appellant focuses on four such individuals. First, he notes that Chester's friend Alan Hilton testified at the 2007 retrial that at the bar, although Appellant was drinking beer, *see* N.T., Feb. 6, 2007, at 43,

---

8. *See supra* note 6.

9. Appellant has organized his brief to consolidate the present claim with the next three. However, the issues are conceptually distinct, they were raised separately in Appellant's notice of appeal, and the PCRA court treated them seriatim. To the extent Appellant's present decision to raise them as multiple parts of a single claim is undertaken in an effort to aggregate prejudice, *see* Brief for Appellant at 67–70, our present disposition does not undermine that objective in light of Appellant's final contention pertaining to cumulative prejudice. *See id.* at 77–79.

he was not falling down, slurring his speech, or swaying and that he did not appear to be drunk, *see id.* at 28; whereas, at the first trial in May 1988, Hilton testified more particularly that Appellant had ingested beer and two shots of liquor. Additionally, in January 1988 Hilton told Joe Stark, an investigator for the public defender's office, that Appellant and Chester were getting "shit faced" at the bar, as memorialized in a report prepared by Stark.

Second, Appellant refers to the testimony of Gale Gardener, another friend of Chester's. On the evening in question, Gardener was present at Chester's apartment, then Appellant's apartment, and then the bar, after which she and Appellant's fiancée Barbara Parr returned to Appellant's apartment to sleep. Gardener testified at the retrial that Appellant: drank alcohol at Chester's residence, *see* N.T., Feb. 7, 2007, at 42, 46; drank alcohol at the bar later on, *see id.* at 48; and was "coherent" upon arriving at his apartment after the killing, *id.* at 63. In view of the passage of over 19 years, however, she was unable to give further details regarding the number and types of alcoholic beverages that Appellant had consumed, and she conceded that her memory was fresher in 1988 when she testified at Appellant's first trial. *See id.* at 51. Appellant acknowledges that, in cross-examining Gardener, counsel showed her a transcript of her 1988 trial testimony in an attempt to refresh her recollection, and Gardener testified at the retrial that she had testified truthfully in 1988 when she described Appellant as "drunk" upon his arrival at his apartment after the killing, *see id.* at 57–58. Appellant complains, however, that counsel failed to: (a) confront Gardener with a statement she gave to police in which she stated that, when Appellant returned to his apartment, he "mumbled" that Chester was alright and then "stag-

gered" into the bedroom; or (b) impeach her with her alleged motive to testify favorably for the Commonwealth by minimizing the amount of alcohol Appellant had consumed. Appellant asserts that such motive stemmed from Gardener's friendship with Chester as well as her status as a Florida probationer based on driving without a license as a habitual offender.

Third, Appellant finds deficient counsel's questioning of Jolanda Thompson, a former co-worker of Chester's who was present at the bar on the night in question. Thompson testified at the retrial that a group of individuals, including Appellant, were all drinking at the bar and that Appellant was loud and boisterous, but she could not recall the specific amount Appellant drank. *See* N.T., Feb. 5, 2007, at 173–75. Appellant avers that counsel failed to "impeach" Thompson with her statement to Joe Stark (as reflected in a report prepared by Stark in January 1988) that Appellant had, in fact, been drinking shots of liquor. Brief for Appellant at 51.

Finally, Appellant highlights the testimony of James Phillips, Jr., the bartender at the Edgely Inn on the night in question. Phillips testified at the retrial that, when he arrived at the bar that evening, Appellant and Chester were sharing a 64–ounce pitcher of beer and that he (Phillips) refilled the pitcher twice. *See* N.T., Feb. 5, 2007, at 210. Phillips also stated that, in addition to the beer, he served one shot of liquor to Appellant, and Appellant threw an empty shot glass across the bar in anger. Appellant faults counsel for failing to elicit that, at the preliminary hearing in January 1988, Phillips testified that he had brought a total of four pitchers of beer to Appellant and Chester, and had served Appellant two or three shots of liquor. Appellant takes particular exception in this regard because, at the time of the events,

Phillips was the bar owner's son and he had become the owner by the time of the retrial. Thus, Appellant posits that counsel should have presented evidence that Phillips had a motive to downplay the amount of alcohol he served Appellant because he was concerned about his business incurring civil liability. Although counsel did attempt (unsuccessfully) to introduce into evidence a civil complaint filed by Milano's parents against the Edgely Inn, Appellant offers that there was other evidence of motive that could have been proffered. In particular, he identifies a statement that Jolanda Thompson gave Joe Stark in which Thompson related that James Phillips, Sr., the owner of the bar in December 1987, had asked her not to say that Chester was drunk that night because Chester was underage. According to Appellant, if counsel had reviewed that statement it would have prompted him to cross-examine James Phillips, Jr. as to whether his father had told him also to minimize the amount of alcohol he served Appellant.

The PCRA court rejected the position that counsel provided deficient stewardship based on the questioning of these four witnesses. The court reasoned in particular that, even to the extent the material in Stark's reports may have been somewhat helpful, Stark credibly testified at the PCRA hearing that he was not reachable when counsel was preparing for the retrial because he was experiencing personal problems and was not maintaining an office, returning phone calls, or responding to contacts. See PCRA Ct. Op. II, slip op. at 23; see also N.T., May 23, 2012, at 43–44, 46–47 (reflecting Attorney Kerrigan's PCRA testimony that he had tried unsuccessfully to contact Stark). The PCRA court also rejected the premise that Gardener could have been confronted with evidence of motive or bias, particularly since Appellant failed to establish a connection between Gardener's status as a Florida probationer and a supposed motive to falsify her testimony. More generally, the court recounted that counsel testified his strategy was to demonstrate extreme intoxication by adducing testimony concerning Appellant's alcohol ingestion from as many witnesses possible. The court reasoned, in this regard, that counsel elicited substantial testimony along these lines and "argue[d] in closing that Appellant was extremely intoxicated at five times the legal limit with a BAC of 0.45 percent." PCRA Ct. Op. II, slip op. at 22. Thus, the PCRA court concluded that Appellant failed to show counsel acted unreasonably or that he suffered prejudice. See id. at 26–27.

A review of the record confirms that guilt-phase counsel adduced significant eyewitness testimony suggesting that Appellant had consumed a very large amount of alcohol on the night of the murder. The jury learned that he was drinking before arriving at the bar, that at the bar he shared several 64–ounce pitchers of beer with Chester and ingested at least one shot of liquor, and that he was loud and boisterous. The jury also heard that Appellant was described by Gardener as being "drunk" at a time when her memory of the events was still fresh. Other individuals besides these four witnesses provided supporting testimony. See, e.g., N.T., Feb. 5, 2007, at 135–36 (testimony of Officer Patrick Connell to the effect that when he encountered Appellant at the bar, Appellant showed signs of intoxication, including smelling like alcohol and becoming belligerent with three armed officers); N.T., Feb. 6, 2007, at 100, 115–16 (testimony of Barbara Sylvia (formerly Barbara Parr) that Appellant "drank a lot when he drank," and that when he arrived at his apartment after the killing he was "drunk" and he "passed out" on the bed); see also N.T., Feb. 8, 2007, at 179 (testimony of Dr.

O'Brien, an expert witness, that Appellant was reported to be "overwhelmingly intoxicated" during the early hours of December 15, 1987, and that "when he returned home he was likewise reported to be stumbling and passed out"). For his part, counsel emphasized Appellant's "severe degree of intoxication" in his summation. N.T., Feb. 9, 2007, at 9.

If counsel had done everything Appellant now alleges he should have done, it is possible the jury would have been left with the impression that he had consumed even more alcohol, but the additional amount would not likely have been significant; as such, it would not have materially aided Appellant's defense in view of the record as a whole. It bears noting, in this latter respect, that counsel called an expert toxicologist, Gary Lage, PhD, to testify concerning Appellant's BAC on the night of the murder. Dr. Lage observed that Appellant drank for more than seven hours that evening, from 7:00 pm until after 2:00 am. See N.T., Feb. 8, 2007, at 26. In view of Appellant's physical characteristics and the number and types of beverages he ingested—and when during the evening he ingested them—the expert estimated that Appellant's BAC during the early morning hours of December 15, 1987, was approximately 0.45 percent. See id. at 28, 57–58. Dr. Lage explained that this was significant because the effects on the brain become severe, and a coma can develop, when a person's BAC reaches the range of .40 to .50 percent. See id. at 30.[10] Thus, we find Appellant's present argument unpersuasive to the degree he suggests that counsel's alleged omissions left the jury with a material misimpression concerning the amount of alcohol he consumed.

Separately, Appellant does not articulate any connection between Gardener's status as a Florida probationer—or as a friend of Chester's—and a motive to minimize the amount of alcohol Appellant drank. Nor would the Stark reports have added meaningfully to the picture of Appellant being heavily intoxicated, as the information contained in them is largely cumulative of that which was brought out at trial. If counsel had been able to impeach Gardener, moreover, it is unclear how this would have aided his case, since Gardener's testimony confirmed that Appellant had ingested a significant amount of alcohol and that he was "drunk." Finally, even if the Stark report on Jolanda Thompson had been available, the relevant portion only pertains to what Phillips' father said to her (Thompson), and not to Phillips himself. As such, the assumption that it would have led to the jury hearing that Phillips' father instructed Phillips to minimize the amount of alcohol he served to Appellant is speculative.[11]

---

10. Counsel was also permitted to read to the jury a paragraph from an affidavit signed by Chester at a time when he was contesting his own responsibility for the murder. The paragraph stated as follows:

On the night of the Milano homicide, Rick drank an extraordinary amount of liquor. By the time he and I arrived at the Edgely Inn, we had consumed not less than two cases of twelve-ounce bottles of beer. At the Edgely Inn Rick and I drank eleven pitchers of beer, Rick drank half a liter of Jack Daniels, and then Rick did two or three shots of Jack Daniels. When we left the Edgely Inn, Rick was drunk out of his mind. By the end of that evening Rick could barely walk. He was stumbling and falling down in the street. I damn near carried Rick to Rich Griscavage's house. N.T., Feb. 8, 2007, at 14.

11. Counsel did cross-examine Phillips about: his interest in the Edgely Inn's well-being, since he was the bar owner's son at the time of the events; his concern with serving a patron too much alcohol; and his practice of "flagging" a patron that seemed unruly—that is, refusing to serve him any more alcohol and/or asking him to leave the bar—which Phillips conceded he did not do with regard

 The Constitution guarantees the accused a fair trial, not a perfect one. *See, e.g., Commonwealth v. Rasheed,* 536 Pa. 567, 570–71, 640 A.2d 896, 898 (1994). Moreover, "[a]lthough hindsight might reveal the comparative worth of alternatives not pursued, an ineffectiveness claim cannot succeed on that basis." *Chester,* 526 Pa. at 612, 587 A.2d at 1384. Here, the differences between the manner in which counsel cross-examined the four witnesses at issue, and the way Appellant now believes he should have cross-examined them, are relatively minor or are based on speculation and conjecture. Appellant's presentation has not brought to our attention any substantial way in which counsel's cross-examination failed to bring to light the contention, and supporting evidence, that he was highly intoxicated on the night in question. Under these circumstances, we agree with the PCRA court's essential determination that Appellant has failed to demonstrate that his attorney's performance was deficient.

### Failure to move to exclude evidence or request a mistrial

 In his next claim, Appellant maintains that counsel erred by failing to object or move *in limine* to exclude certain "bad acts" evidence or request a mistrial once the evidence was adduced. In particular, Appellant takes issue with testimony that, when he was at the Edgely Inn, he furnished alcohol to a minor and made a sexual remark to Gail Gardener.

During the evening of December 14, 1987, Appellant, his fiancée Barbara Parr, Chester, and Gardener were at the apartment Parr shared with Appellant. At some point, Appellant and Chester left to go to the Edgely Inn, and they took Parr's

son with them, who was nine or ten years old. Later that night, Parr and Gardener joined Appellant and Chester at the bar for a brief period, during which two things occurred: Appellant stated to Gardener that he wanted to "run his tongue across [her] teeth," N.T., Feb. 7, 2007, at 28, and Parr became angry with Appellant because someone told her that Appellant and Chester had given her son alcohol. Specifically, Parr testified as follows on direct examination by the Commonwealth:

Q. What did you do when you were at the bar?

A. My son was there and he had been drinking.

Q. What do you mean by that?

A. He was sick. He was drunk. They had given him alcohol.

[Defense counsel]: Objection.

THE COURT: Sustained. The jury shall disregard the part that they had given him alcohol. She can testify as to the observation that he was drunk and he was getting sick.

BY [the Commonwealth]:

Q. Well, did Rick Laird say anything to you about giving him alcohol?

A. Yeah.

Q. What did he say?

A. That they had given it to him, him and Frank.

N.T., Feb. 6, 2007, at 69–70.

Appellant faults counsel for failing to: move *in limine* to exclude this evidence; renew his objection to the above testimony; and request a mistrial after that testimony was elicited. He theorizes that such information cast a negative light upon his character, making it less likely that the

___

to Appellant. *See* N.T., Feb. 5, 2007, at 235–36, 250. Furthermore, during his guilt-phase summation, counsel emphasized Phillips' mo-

tive to understate the amount of alcohol he served to Appellant. *See* N.T., Feb. 9, 2007, at 29–32.

jury would accept his diminished-capacity defense. *See* Brief for Appellant at 63–66.

We may assume that testimony to the effect that Appellant made a sexual remark to Gardener and that he and Chester gave alcohol to a minor child was likely to cause the jury to view Appellant's character unfavorably. Still, Appellant stipulated to having participated in Milano's murder, and the only question for the jury was whether he acted with specific intent. The above proofs were largely collateral and/or irrelevant to that question. In the context of a guilt phase that included five days of testimony, moreover, this information was fairly isolated and minor, and the Commonwealth did not use it in its closing argument. *See* N.T., Feb. 9, 2007, at 35–58. Hence, admission of the testimony does not undermine our confidence in the verdict. As such, even if we assume, *arguendo,* that the underlying claim has arguable merit and counsel lacked a reasonable strategy, Appellant has not proven prejudice. *Cf. Commonwealth v. Busanet,* 572 Pa. 535, 549, 817 A.2d 1060, 1068 (2002) (holding that prejudice was not proved where counsel unnecessarily made the jury aware of the defendant's prior assault conviction, because the Commonwealth presented substantial independent inculpatory evidence at trial and the reference to the assault conviction was "isolated and not exploited" by the Commonwealth).

### Failure to prepare expert witnesses

■ Next, Appellant argues that his counsel were ineffective for failing adequately to prepare his expert witnesses for the guilt phase of trial. During that portion of the proceedings, Appellant called three psychological or psychiatric experts to testify regarding his inability to form specific intent on the night in question.

These included Henry Dee, PhD, a clinical neuropsychologist,[12] Robert Fox, MD, a forensic psychiatrist, and John O'Brien, MD, JD, another forensic psychiatrist. Drs. Dee and Fox had evaluated Appellant for his first PCRA appeal in 1997 and had developed mitigating evidence based on Appellant's life history and other factors. Appellant suggests that their effectiveness in 2007 was limited because counsel did not meet with them until shortly before trial or request that they re-evaluate Appellant for purposes of the diminished-capacity defense. Appellant also asserts that counsel was ineffective for failing to require that these experts read the transcript of his first trial so they would be prepared to answer cross-examination questions about how Appellant could have been operating in an alcoholic blackout when he acted to conceal evidence shortly after the incident and was able to testify about the events at his first trial.

The PCRA court rejected this claim primarily on the basis that Appellant did not explain how the experts' testimony might have been more helpful if trial counsel had taken the suggested actions. The court observed that Appellant benefitted from the testimony of four experts: Dr. Lage, who, as noted, estimated Appellant's BAC at 0.45 percent; Dr. Dee, who testified that Appellant had sustained brain damage from several head traumas, including an early–1980s skull fracture, and that intoxication would exacerbate the effects of the brain injury to the point where Appellant was unable to plan and carry out a homicide; Dr. Fox, who testified that Appellant could not have formed a specific intent to kill; and Dr. O'Brien, who stated that Appellant's level of intoxication would seriously impair any person's functioning and cognition, but when brain damage is added

---

**12.** Dr. Dee explained that a clinical neuropsychology is the study of the relationship between brain damage and behavior. *See* N.T., Feb. 8, 2007, at 73.

to the picture the effects would become worse. The court suggested that little would have been gained by further clinical examination of Appellant, as it was difficult to see how the experts' opinions could have been more favorable to Appellant. *See* PCRA Ct. Op. I, *slip op.* at 4–7; PCRA Ct. Op. II, *slip op.* at 45–47.

The record supports this determination. During the first PCRA proceedings in 1997, Dr. Dee testified concerning Appellant's mental-health ailments, including brain damage, attention-deficit hyperactivity disorder (ADHD), and a highly dysfunctional family history. He opined that these factors, when combined with the fact that Appellant had consumed a "toxic" quantity of alcohol, would have substantially impaired Appellant's cognitive functioning. N.T., Jan. 21, 1997, at 120–26. Although much of Dr. Dee's 1997 testimony related to penalty-phase mitigation, *see, e.g., id.* at 124 (expressing that Appellant suffered from an "extreme mental or emotional disturbance"), he also opined that Appellant's level of cognitive impairment on the night in question undermined his ability to form a specific intent to kill. *See id.* at 127.

In his testimony at the retrial, moreover, Dr. Dee recounted that, for the 1997 proceedings, he had spent a full day with Appellant in July 1996, interviewing him and administering two batteries of psychological and neuropsychological tests. Dr. Dee noted that he had also interviewed Appellant's mother and brother and had reviewed numerous records, including psychiatric reports, toxicology reports, hospital and other medical records, police records, and testimony from prior proceedings. *See* N.T., Feb. 8, 2007, at 78–80. Dr. Dee ultimately expressed his expert opinion, based on all of the available data, that the cognitive impairments to which Appellant was subject amounted to diminished capacity for purposes of Pennsylvania law. *See id.* at 86, 89–90. Appellant has not explained how additional evaluations undertaken closer to the time of the 2007 retrial would have allowed Dr. Dee to testify more persuasively concerning Appellant's diminished capacity in 1987.[13]

Likewise, Dr. Fox testified at the 1997 hearing that Appellant was operating in an "alcohol intoxication delirium" which, when combined with his brain damage, would have prevented Appellant "from being able to form intent." N.T., Jan. 22, 1997, at 169; *see also id.* at 171 (reflecting Dr. Fox's opinion that Appellant had diminished capacity).

At the 2007 retrial, Dr. Fox also listed the items on which he was relying for his expert opinion, including: his in-person interviews with, and professional evaluation of, Appellant; his interviews with Appellant's brother and mother; various records of the same type as those referenced by Dr. Dee; and Dr. Dee's neuropsychological evaluation and report. *See* N.T., Feb. 8, 2007, at 123–26. Based on these sources, Dr. Fox stated that, at the relevant time, Appellant was suffering from a number of psychiatric impairments, including post-traumatic stress disorder (PTSD) as a result of his abusive childhood (in which his father gave him alcohol as a young boy, beat him arbitrarily, and sexually abused him), ADHD, and organic brain disorder resulting from repetitive head injuries as well as fourteen years of drug abuse and alcohol dependency. Dr. Fox explained at length the way these factors adversely affected Appellant's memory and undermined his executive

---

**13.** Drs. Dee and Fox did meet with Appellant before the retrial, but these meetings, which lasted an hour or less, evidently did not subsume new psychological evaluations.

functioning—*i.e.*, decision making and impulse control—including the ability to plan actions and carry them out. *See id.* at 132–35; *see also id.* at 142–43 (testimony of Dr. Fox that "[a] person who has decreased cognitive ability and impaired executive functioning ... and brain damage and then you add a huge amount of alcohol which also impairs executive function, while they may be capable of behaviors—walking, talking, driving, cutting somebody's throat—they are not capable of making conscious decisions, conscious intent in the way that we normally think about that process"). Like Dr. Dee, Dr. Fox opined that Appellant had diminished capacity as that term is defined by Pennsylvania law, and was unable to form a specific intent to kill. *See id.* at 144–45, 170.

Again, Appellant has not explained how an additional evaluation shortly before the retrial would have allowed Dr. Fox to testify more forcefully or convincingly that Appellant suffered from diminished capacity. Nor are we persuaded that the experts' opinions were weakened by a supposed failure to read the 1988 trial transcript. Although Dr. Dee indicated that he had not done so, Dr. Fox stated that he did. *See id.* at 123, 154. As well, Dr. Fox explained to the jury that a person whose memory of the events in question was impaired by operating in an alcohol-induced blackout could later give an account, apparently from memory, of the events that transpired during the relevant interval. In particular, Dr. Fox expressed that, through a process known as "confabulation," individuals who are extremely intoxicated unconsciously invent details .

> to fill in the blanks, if you will, for the period of time that they don't remember.... Some of it may be based on vague ... parts of the story that they remember. It will be what they piece

together from the state of their clothing or what people say to them the next day in an attempt to try to put things together.

*Id.* at 141–42; *see also id.* at 70 (reflecting similar testimony by Dr. Lage). On cross-examination, the Commonwealth confronted Dr. Fox with the transcript of Appellant's testimony from the 1988 trial. He admitted it was fairly detailed but maintained that it could nonetheless have been the result of confabulation, *see id.* at 157, 168, an assertion that was supported by Dr. O'Brien's independent testimony that "confabulation can be very detailed." *Id.* at 194.

In light of the foregoing, we conclude that the record adequately supports the PCRA court's finding that "trial counsel already had favorable testimony from the experts to support a diminished capacity defense[.]" PCRA Ct. Op. II, *slip op.* at 46; *accord id.* at 47 ("Little would have been gained from further evaluations, as the experts already were able to provide favorable opinions on the ultimate issue of diminished capacity."). As for counsel's failure to have Drs. Dee and Fox re-evaluate Appellant in 2006 or 2007, Appellant has not explained how such reevaluations could have been helpful. The prior evaluations were undertaken closer in time to the offense, and these are the assessments that the experts relied upon. By the time of the retrial, moreover, the offense had occurred more than 19 years earlier. *Accord* Brief for the Commonwealth at 83 ("[T]here was little to be gained from additional meetings with Appellant in 2007, twenty years after the murder and ten years after [Drs. Dee and Fox] had already rendered an expert opinion regarding Appellant's diagnoses."). Thus, Appellant's underlying claim lacks arguable merit.

### Failure to introduce medical records

▮ In a related claim, Appellant contends that trial counsel were ineffective for failing to introduce medical documentation supporting his allegation that he suffered from brain damage at the time of the murder. According to Appellant, these records would have strengthened his diminished capacity defense.

Dr. Dee's guilt-phase testimony included references to having reviewed records of a skull fracture that Appellant sustained several years before the murder when he fell off the hood of a moving car. Dr. Dee also discussed the family's reports that Appellant suffered other head injuries as a child and during adolescence. Appellant faults counsel for not introducing into evidence records of all of these injuries. He suggests that the lack of documentation harmed Dr. Dee's credibility on cross-examination because Dr. Dee could not support his testimony that there were multiple head injuries as opposed to only a single injury. Appellant argues that the records, therefore, "would have negated any contention that Appellant fabricated [his] injuries to help support his diagnosis of brain damage[.]" Brief for Appellant at 57.

In the PCRA court, this averment was part of a broader claim involving numerous medical and police documents from the 1970s and 1980s. Although PCRA counsel were ultimately able to obtain many of these records and supply them to the court, the court found them largely illegible and added that they could not be authenticated because PCRA counsel were unable to produce a records custodian or the surviving radiologist to authenticate

them. See PCRA Ct. Op. II, *slip op.* at 29. The court also determined that, even if the records could have been admitted at the retrial, there was no reasonable likelihood they would have altered the outcome. In this respect, the court recited that the defense presented testimony from three medical experts during the guilt phase, all of whom were questioned extensively as to Appellant's brain damage and the effects of intoxication on his ability to form a specific intent to kill. According to the PCRA court, these experts "referenced and discussed the medical records at issue here, despite the fact that they were not admitted as an exhibit." PCRA Ct. Op. II, *slip op.* at 30–31.

Presently, Appellant does not contest the PCRA court's determination that the records would have been inadmissible at his retrial due to a lack of authentication. See Pa.R.E. 901; *Commonwealth v. Zook,* 532 Pa. 79, 97, 615 A.2d 1, 10 (1992) ("Generally, for a document to be admissible it must be relevant and authenticated."). Thus, Appellant makes no effort to establish that the records would have been admissible, and by extension, that trial counsel can be faulted for not introducing them. See *Commonwealth v. Smith,* 490 Pa. 380, 387, 416 A.2d 986, 989 (1980) (explaining that counsel cannot be deemed ineffective for failing to pursue a meritless course of action).

As well, the Commonwealth did not dispute that Appellant suffered at least one serious head injury that included a skull fracture in the early 1980s when he fell from a moving vehicle.[14] The contested issue in the guilt phase was whether the resulting brain damage, combined with

---

**14.** Although Appellant implies that the Commonwealth "attacked" Dr. Dee's opinion based on a lack of medical documentation, Brief for Appellant at 57, Appellant only references one instance during the cross-examina- tion of any defense expert in which the prosecutor questioned the reliability of the family's reports of head injuries earlier than the one involving the fall from the moving vehicle. *See* N.T., Feb. 8, 2007, at 81.

other factors such as alcohol consumption, impaired Appellant's cognitive functioning so that his capacity to form a specific intent to kill was diminished. Whether that brain damage stemmed from one or multiple head injuries was largely beside the point, particularly as multiple experts referred to psychiatric testing and evaluations as the primary basis for their conclusions regarding the nature and severity of Appellant's impaired mental functioning. *See* N.T., Feb. 8, 2007, at 82 (testimony of Dr. Dee); *id.* at 128–31 (testimony of Dr. Fox); *cf. id.* at 94 (reflecting Dr. Dee's explanation that neuropsychological testing is more accurate than MRI imaging in detecting brain damage). Consequently, we agree with the PCRA court's conclusion that, even if the medical records had been introduced at trial, there is no reasonable likelihood that the outcome of the proceedings would have been different.

### *Failure to present a more detailed mitigation case*

 Appellant's first penalty-phase claim is based on an allegation that his counsel failed to investigate and present available and compelling mitigation that would have reduced Appellant's moral culpability in the eyes of the jury.[15] Appellant argues that counsel presented only minimal proofs regarding the serious abuses and impairments he suffered during childhood and adolescence, and which caused lifelong emotional scars that led him to self-medicate with drugs and alcohol. Appellant proposes that, even though his sentencing jury heard some evidence about these matters, they did not learn the full extent of the adversities he faced as a

child. In particular, Appellant highlights the difference between the testimony given at his 1997 PCRA hearing by his brother Mark Laird and defense experts Drs. Dee and Fox, and the more abbreviated testimony provided by these individuals at his 2007 penalty hearing. Separately, inasmuch as Appellant was sexually victimized by his father, he faults counsel for not hiring an expert in male sexual abuse and its psychological effects.

This claim has two parts. The first relates to the alleged brevity of the testimony given by Mark Laird and Drs. Dee and Fox at the penalty hearing when compared to their earlier testimony. The second pertains to counsel's failure to supplement the penalty-phase expert evidence with additional testimony from someone who could have more particularly addressed the manner in which the childhood sexual abuse affected Appellant. We will address these contentions separately, starting with a review of the testimony given by Mark Laird, Dr. Dee, and Dr. Fox at the penalty hearing.

Mark Laird testified in the penalty phase and recounted how he and Appellant were regularly beaten by his father without provocation and for seemingly arbitrary reasons, *see, e.g.*, N.T., Feb. 12, 2007, at 70 (relating that Appellant's father "snapped his fingers ... and if you didn't know what he meant by snapping his fingers ... you got your ass beat"), and that his father used a military belt and a large ring to administer the beatings. Mark noted that Appellant was beaten more violently than himself because Appellant was the older of the two brothers. As for the

---

**15.** *See generally Penry v. Lynaugh*, 492 U.S. 302, 319, 109 S.Ct. 2934, 2947, 106 L.Ed.2d 256 (1989) (*"Penry I"*) (referring to "the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to

emotional and mental problems, may be less culpable than defendants who have no such excuse." (internal quotation marks omitted)), *abrogated on other grounds, Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

ring, Mark recalled that it had a large letter 'R' embossed on its surface and that his father would "thunk" both brothers on the head so hard that it left an 'R' mark in their skin and made them dizzy. *Id.* at 71. Separately, Mark testified that he and Appellant witnessed their father violently beat their mother, leaving rooms in shambles due to household items being broken during the altercation. Mark stated that the beatings became so severe that, when Appellant was approximately eleven years old, their mother left their father and moved to Pennsylvania to "rebuild her life with her two sons." *Id.* at 83. He observed that he had only isolated memories of the time period because he had "blocked it out[.]" *Id.*

As for sexual abuse, Mark testified to memories of his father and Appellant being in the bedroom with the door closed, and that when Mark opened the door for a moment he saw the two naked. *See id.* at 71–72, 82. Mark added that this was "the norm" during that period of time, albeit he clarified that at his young age he did not understand what was taking place in the bedroom. *Id.* at 83.

Mark also testified at some length concerning Appellant's progressive, years-long descent into a pattern of alcohol and drug abuse during Appellant's adolescence. *See id.* at 85–88. Finally, Mark observed that, unrelated to the beatings by his father, there were "many" incidents in which Appellant was "hit in the head." *Id.* at 84. These included the mishap involving Appellant falling off of a moving vehicle, *see id.* at 85, as well as a separate occasion where someone struck Appellant in the back of the head with a two-by-four, causing Appellant to fall to the ground and temporarily lose his vision. *See id.* at 84–85.

Appellant describes the above as a "bare bones" presentation that omitted many de-

tails. Brief for Appellant at 14. He contrasts it with the 1997 hearing in which PCRA counsel elicited more information from Mark about the beatings and sexual abuse. A review of that proceeding reveals that Mark did provide several additional details on these and related topics. In particular, he testified that: their father was an alcoholic and drank frequently; their father verbally berated Mark and Appellant by calling them names and telling them they were worthless; when being physically abused, the brothers were prohibited from crying on pain of further beatings; the boys' mother would sometimes instruct them to hide from their father; the military belt was made of leather and had a large buckle; when Appellant was young he stayed with his father in Japan for a short time and returned home with a scar on his forehead due to an altercation with his father; and there was one occasion later in life when Mark learned from Appellant that the incidents in which Mark would see his father and Appellant naked in the bedroom involved sexual abuse. *See* N.T., Jan. 21, 1997, at 202–213.

We agree with Appellant that, had these additional details been elicited from Mark at the penalty hearing, it would have supplemented the information the jury heard. Still, the essential points regarding the severity of the physical beatings to which Appellant was subjected, the sexual abuse, and the experience of seeing his family members brutalized by his father, all formed part of Mark's testimony at the penalty hearing. Although Mark omitted any mention of the boys' being instructed to hide from their father and the father's name-calling, and although he only indirectly testified concerning the presence of sexual abuse, the sentencing jury heard from other witnesses about most of these facets of Appellant's childhood. *See, e.g.,*

N.T., Feb. 13, 2007, at 15 (testimony of Dr. Fox, based on the life history he obtained from Appellant and his interviews with family members, that Appellant was the victim of emotional and sexual abuse as a child); *id.* at 17 (reflecting Dr. Fox's testimony that Appellant revealed to him that his father "forced him to perform oral sexual acts on him"); *id.* at 59 (testimony of Dr. Dee that Appellant "told me he had been sexually abused as a child [by] a male family member," and he learned from Mark Laird "that that family member was his father"). Thus, when viewed in the context of the penalty phase as a whole, the difference between the information provided by Mark Laird in 1997 and in 2007 was not extensive.

Notably, as well, jurors found seven mitigating factors relating to this information: physical abuse; sexual abuse; emotional abuse; witnessed the abuse of others; psychological consequences of abuse; substance abuse; and alcohol abuse. *See* First Degree Murder Sentencing Verdict Slip at 3, *reproduced in* Commonwealth Exh. 4 (Feb. 13, 2007).[16] In view of the foregoing, the record does not reflect that counsel's performance fell below the standard of reasonable professional assistance required by *Strickland. See Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. Therefore, the underlying claim as it relates to Mark Laird's testimony lacks arguable merit.

It is also worth observing that, in his testimony during the 2012 PCRA hearings, Attorney Wiliams explained that, although Mark had been forthcoming in 1997, at the retrial ten years later he was noticeably less cooperative. As such, counsel added, he believed that any attempt to dwell on the life-history issues at length or push for further details could have risked a perception among jurors that Mark was less than eager to assist his brother in avoiding the death penalty. *See* N.T., May 23, 2012, at 170, 192. For his part, Mark corroborated counsel's observation, noting that he had testified against several criminal defendants in Bucks County in the pre–2007 timeframe and had thereby made enemies in the area. *See* N.T., June 19, 2012, at 14. Accordingly, and in view of the media coverage, Mark stated that having to appear at the courthouse for the retrial made him fear for his safety so that he was not entirely focused on the proceeding—but rather, was "watching who's coming through the door." *Id.* at 24; *see also id.* at 21 (recounting that, during his time at the courthouse, he was "looking around for people that shouldn't be there" and "avoiding the press").

Although the PCRA court did not expressly rely on this facet of the PCRA evidence in rejecting the present claim, the relevant testimony was uncontradicted and tended to demonstrate that counsel had a reasonable strategy for his approach to examining Mark Laird at the penalty phase, in which the most significant aspects of Appellant's traumatic childhood were brought to light, but some of the more peripheral details were left out. *See generally Commonwealth v. Williams,* 587 Pa. 304, 311, 899 A.2d 1060, 1064 (2006) ("If counsel's chosen course had some reasonable basis, the inquiry ends[.]"). For this additional reason, we conclude that counsel's performance was not constitutionally deficient.

As part of this claim, Appellant also faults counsel for failing to obtain more detailed testimony from Drs. Fox

---

**16.** One or more jurors also concluded that Appellant's good conduct in prison comprised an additional mitigating factor. The only proposed mitigator that the jurors did not find was that Appellant stipulated to having participated in the murder.

and Dee during the 2007 penalty phase—again, comparing their 2007 testimony to the information they supplied at the earlier PCRA hearing. In this part of his argument, Appellant recounts that, in 1997, these experts were on the witness stand for a much longer period of time than at the penalty hearing, meaning that their testimony at the latter hearing "offered far fewer details and explanations about Appellant's cognitive impairments." Brief for Appellant at 16. As to the substance of the allegedly incomplete testimony, Appellant focuses primarily on Dr. Fox, who he says elaborated in 1997 concerning his "severe but untreated form of ADHD," his need to "self-medicate the symptoms," the fact that his ADHD led to additional abuse by his father, and the fact that the Department of Corrections was then treating him for the disorder. *Id.* at 15; *see also id.* at 11 (suggesting that: the evidence of childhood abuse was elicited at the penalty hearing in a "check-list fashion, as the experts simply responded 'yes'" when asked whether Appellant suffered from abuse or brain damage; the jurors learned little or nothing about the life-long consequences of Appellant's ADHD, brain damage, and PTSD; and they therefore gave the mitigating factors that they did find little or no weight).

This argument is contrary to the record. Both experts testified during the guilt phase of trial, and their testimony was incorporated into the penalty phase.[17] These experts gave additional testimony in the penalty phase. In the guilt phase Dr. Dee, as noted above, discussed his evaluation of Appellant—which, again, was based on interviews with Appellant and his family members, medical and other records, and the administration of two batteries of tests—and stated that Appellant suffered

from cognitive impairments resulting from brain damage, causing mental-health deficits including those which affected his memory functioning and executive functioning. In the penalty phase, he discussed at considerable length the graphic nature of the abuse visited upon Appellant, his brother, and his mother when Appellant was a young child, ultimately culminating in Mrs. Laird's decision to move away with her two sons. The nature of Dr. Dee's testimony is illustrated by the following excerpt:

> [Appellant's] childhood was marked by quite severe abuse of all kinds—physical abuse, emotional abuse and sexual abuse.... The physical abuse visited on these boys was pretty severe. There were beatings that were not contingent upon any behavior of theirs that they could tell. In other words, they didn't know why they were being beaten. Their father reportedly beat them with anything at hand. Even had some sort of creative punishment like kneeling on dried beans which are like small pebbles. And the sexual abuse began, apparently, fairly early in life. [Appellant] was forced by his father to perform fellatio.... [S]ubsequent to that his father would humiliate him and further emotionally abuse him by telling him he was a filthy [sic], he was a nasty boy, to go wash out his mouth and shouldn't be doing things of that sort, which, of course, is terribly confusing to anybody.... [T]he physical and emotional abuse were visited to all members of the family, particularly during periods of alcoholic binges on his father's part. His father was described by all of them as an alcoholic. And the cycle violence [sic] toward them[,] that is, the mother and

---

17. *See* N.T., Feb. 12, 2007, at 26. Such incorporation also expressly included the testimony of Appellant's other two experts, Drs. Lage and O'Brien. *See id.* at 68.

the two children, continued until Mrs. Laird told me she found it unbearable. N.T., Feb. 13, 2007, at 59–62.

Dr. Dee proceeded to describe how Appellant's alcohol use began at an early age through no fault of his own, as his father would place liquor in Appellant's soft drinks and deceive Appellant into drinking vodka. *See, e.g., id.* at 63 (describing that, when Appellant was eight years old, he came into the house after performing yard work on a hot day, and his father, as an "amusing prank," gave him a glass of vodka, telling him it was water). Dr. Dee explained that this ultimately led to Appellant repeating his father's pattern of binge drinking up to and including the time of the homicide.

The expert additionally highlighted Appellant's ADHD diagnosis early in life and described how this affected his emotional development—particularly since it went untreated (notwithstanding that his parents were notified about it), eventually leading to rejection by teachers and peers and, ultimately, a failure to complete high school. *See id.* at 63–66. He noted, as well, that Appellant used amphetamines during adolescence, which was consistent with untreated ADHD because such drugs are effective in alleviating the symptoms of ADHD. Dr. Dee further developed that Appellant suffered significant brain damage and that this, together with Appellant's abusive childhood, substantially affected his functioning as an adult. He diagnosed Appellant with chronic brain syndrome with mixed features and concluded to a reasonable degree of psychological certainty that, at the time of the crime, Appellant was under the influence of an extreme mental or emotional disturbance. *See id.* at 77–78; 42 Pa.C.S. § 9711(e)(2).

Dr. Fox testified in the penalty phase to similar effect. *See, e.g.,* N.T., Feb. 13,

2007, at 6 (describing Appellant's father as a chronic alcoholic who was physically and psychologically abusive toward Appellant, his mother, and his brother, and sexually abusive toward Appellant). Like Dr. Dee, Dr. Fox recounted that Appellant's father gave him alcohol at an early age, and then Appellant began drinking alcohol voluntarily in his teens. He also observed that Appellant's father often struck Appellant on the head with his ring and noted that Appellant's "accumulative head injuries over the years"—including the skull fracture and concussion Appellant sustained upon falling off a moving vehicle—were verified by X-rays. *Id.* at 9. Dr. Fox stated that these records corroborated the results of Dr. Dee's neuropsychological testing. *See id.* at 9–10.

As well, Dr. Fox expressed his view that Appellant suffered from both ADHD and PTSD, the latter being an Axis–I diagnosis, *i.e.*, a "major psychiatric illness in the nomenclature of the American Psychiatric Association and all international medical bodies." *Id.* at 10–11. Dr. Fox explained the manner in which PTSD arises and how it affects behavior:

It's a condition that results from a person being exposed to a trauma that is potentially life threatening, and in the case of individuals who were sexually abused and physically abused and psychologically abused in childhood is considered to be the result of accumulative trauma, not just a single event.... So children who are systematically abused over years, as [Appellant] was, very often suffer from post traumatic stress disorder. That's characterized by difficulties with the management of emotions, by paranoia, by difficulty in interpersonal relationships; by flashbacks and other types of anxiety symptoms.

N.T., Feb. 13, 2007, at 11.

Additionally, Dr. Fox diagnosed Appellant with alcohol dependency, a history of

polysubstance abuse, and mood disorder resulting from head trauma, which, he explained, tends to bring about personality changes due to damage to the areas of the brain that control personality. *See id.* at 11–13. Dr. Fox, like Dr. Dee, eventually concluded to a reasonable degree of scientific certainty that, at the time of the incident, Appellant suffered from an extreme mental or emotional disturbance. *See id.* at 14.[18]

Notwithstanding the above, Appellant posits that a full presentation of mitigation evidence would have included even more detailed testimony about the clinical aspects of his cognitive impairments. Appellant references *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), and *Commonwealth v. Smith*, 606 Pa. 127, 995 A.2d 1143 (2010), as presenting analogous scenarios. He suggests that, as in those cases, if additional information had been included, there is a reasonable likelihood the outcome would have been different. *See Wiggins*, 539 U.S. at 538, 123 S.Ct. at 2544; *Smith*, 606 Pa. at 178, 995 A.2d at 1173.

We note, however, that the present case is materially different from *Wiggins*. In that matter, although counsel were aware from Wiggins' presentence report that he had endured a difficult childhood, *see Wiggins v. State*, 352 Md. 580, 724 A.2d 1, 15 (1999); *see generally Wiggins*, 539 U.S. at 516–17, 123 S.Ct. at 2533 (detailing the physical, psychological, and sexual abuse Wiggins suffered as a child), they elected not to investigate further and ultimately presented no information on the subject to the jury. Clearly, that is not true of trial counsel in the present matter, as counsel employed four expert witnesses and en-sured that two of them provided extensive and detailed testimony in the penalty phase concerning Appellant's abusive childhood, his subsequent head injuries, his mental-health impairments, and the effects all of these factors had on his cognitive functioning. Further, the jury was instructed that these experts' guilt-phase testimony was part of the penalty phase through incorporation, so that their cumulative penalty phase testimony was even more detailed.

Nor is this case similar to *Smith*. As in *Wiggins*, Smith's counsel was aware of Smith's abusive childhood and the correlation between such a family history and mental impairments, but he made no attempt to present mitigating evidence along these lines. Additionally, it was suggested to counsel that a psychiatrist who testified in the guilt phase (relating to the defense of cocaine-induced psychosis) should evaluate Smith for the penalty phase, but counsel nonetheless "ignored the possibility that mental health mitigating evidence existed which would be helpful in the penalty phase." *Smith*, 606 Pa. at 176, 995 A.2d at 1172. Smith's counsel also overlooked juvenile and hospital records that a post-conviction expert described as "red flags" which signaled the need to develop mental-health mitigation. Finally, despite knowing that Smith had been treated for substance abuse, counsel did not seek Smith's treatment records or juvenile file. Under these circumstances, and in light of a post-conviction evidentiary record containing voluminous potential mitigation that was foregone, this Court expressed that counsel "myopically focused only on the guilt phase defense of cocaine-induced psychosis" and improperly "offer[ed] only gener-

---

**18.** Dr. Fox also testified that Appellant "suffered from a form of diminished capacity," *id.,* although he did not expressly state that Appellant's capacity was impaired in terms of his ability to appreciate the criminality of his conduct or conform his conduct to the requirements of law. *See* 42 Pa.C.S. § 9711(e)(3).

alized character evidence at the penalty phase." *Id.* Here, by contrast, although the 1997 post-conviction testimony of Drs. Dee and Fox may have been lengthier than the testimony they offered a decade later during the penalty phase, there was little difference in terms of substance. *Accord* PCRA Ct. Op. II, *slip op.* at 52 ("Appellant's argument about the insufficient length of testimony by Dr. Fox and Dr. Dee lacks any merit [because] [t]he focus is on the substance of the testimony.").[19]

▮ In the second part of this claim, Appellant argues that a full presentation of mitigating evidence would have included testimony from an expert on the long-term effect of childhood sexual abuse on males in particular. Appellant states that David Lisak, PhD, a clinical psychologist, testified about this topic at the 2012 PCRA proceedings. Appellant maintains that an expert such as Dr. Lisak could have described how his father's actions in sexually abusing him over a period of years led to an emotional state that included confusion, self-loathing, guilt, shame, and humiliation. Such an expert, according to Appellant, could also have: explained that Appellant's use of methamphetamines beginning at age twelve was a "classic example of self-medication" as this drug is known to alleviate the symptoms of PTSD; obtained an accurate and thorough social history by using specialized techniques to overcome Appellant's "understandable reluctance to

access memories of himself as a child;" and conveyed to jurors that when a male child is sexually victimized, it "leav[es] him profoundly scarred and caus[es] constant doubt about his capacity to protect the integrity of his most basic boundaries." Brief for Appellant at 19–20. Appellant concludes that there is a meaningful distinction between the "almost bald assertions of abuse and impairment that jurors heard and a detailed and corroborative narrative that would have been offered by effective counsel." *Id.* at 20.[20]

It is evident from the discussion above that the experts who testified at the penalty hearing provided significant, detailed information concerning Appellant's unfortunate childhood, his mental-health impairments such as PTSD and ADHD, his long-term substance abuse and alcohol dependency, and his brain damage stemming from serious head injuries. The jury was also informed that these factors, combined with Appellant's heavy alcohol ingestion during the hours leading up to the crime, significantly affected Appellant's cognitive functioning. Having been so informed, the jury found seven distinct mitigating factors relating to Appellant's life history and mental-health impairments. *See* text accompanying *supra* note 16.

A review of the post-conviction record reveals that Dr. Lisak related several examples of violence that were not mentioned at trial, such as an incident in which

---

19. Appellant references other cases which are similarly distinguishable. *See, e.g.,* Brief for Appellant at 12 (citing *Porter v. McCollum,* 558 U.S. 30, 130 S.Ct. 447, 175 L.Ed.2d 398 (2009) (*per curiam*) (finding ineffective assistance where penalty-phase counsel presented no life-history or mental-health mitigation notwithstanding that the defendant had an abusive childhood, was traumatized by multiple wartime combat experiences, and suffered from brain damage which could manifest in impulsive, violent behavior)).

20. Appellant also expresses that an expert such as Dr. Lisak could have testified regarding physical abuse by Appellant's stepfather. However, Dr. Lisak clarified that any allegation by Appellant regarding altercations with his stepfather was largely collateral to the main issue in that it would only have been relevant to the timing of when Appellant left home. Thus, Dr. Lisak never attempted to interview Appellant's stepfather or otherwise ascertain whether the allegation was true. *See* N.T., May 24, 2012, at 165.

Appellant and his brother witnessed an apparent attempt by their father to strangle their mother with his hands. *See* N.T., May 24, 2012, at 113. Dr. Lisak was also able to provide some additional perspective concerning the level of vulnerability felt by children who are abused—particularly by a parent to whom they would ordinarily look for protection—and the tendency of abused boys to deal with such feelings of vulnerability by adopting what the expert termed a hyper-masculine persona as they progress into adolescence. *See* N.T., May 24, 2012, at 115. Still, the factual information Dr. Lisak could have supplied about Appellant's childhood would have been largely cumulative of that provided by Drs. Dee and Fox, as well as Mark Laird, all of whom informed the jury about the nature and severity (and several examples) of the physical and sexual abuse Appellant suffered at the hands of his father. Under these circumstances, Appellant has not demonstrated that further testimony from Dr. Lisak was necessary to avoid prejudice. *See Commonwealth v. Wayne*, 553 Pa. 614, 642, 720 A.2d 456, 470 (1998) (reciting that, when a PCRA petitioner claims counsel was ineffective for failing to call a witness, the petitioner must demonstrate, *inter alia*, that the witness's testimony was necessary to avoid prejudice). In this regard, the PCRA court expressed that

> doctor after doctor could evaluate Appellant and likely uncover additional details from Appellant's past with different theories about how those events in his life impacted him. Nonetheless, trial counsel presented testimony directly from a family member and through two different experts who conducted multi-

ple interviews. The experts presented opinions that Appellant suffered from physical, sexual, emotional, and psychological abuse, had diagnoses of brain damage, memory impairment, drug and alcohol dependence, ADHD, and PTSD.

PCRA Ct. Op. II, *slip op.* at 53. The court ultimately concluded that counsel "were not ineffective for failing to present additional details that would have been insignificant considering the evidence as a whole." *Id.*

While we do not necessarily endorse the concept that Dr. Lisak's testimony would have been "insignificant," neither do we believe, in view of the record as a whole, that it was reasonably likely to have convinced a juror to alter his or her balancing of the mitigating circumstances against the kidnapping aggravator. In this latter respect, although Appellant describes the aggravator as "weak," Brief for Appellant at 24, we note that kidnapping is a serious crime that is likely to terrorize virtually anyone who becomes the victim of it. Here, Anthony Milano was outnumbered two-to-one by individuals who had consumed alcohol and had taunted him about his sexual orientation. At least one of these individuals (*i.e.*, Appellant) was much larger than Milano and had been acting in an obstreperous and somewhat bullying manner throughout the evening—even to the point of swearing at three armed officers. The jury heard that Milano had agreed to give Appellant and Chester a ride, but at some point during the ride he was apparently forced to do their bidding in terms of driving to other places with no assurance as to when he would be free of their dominating presence.[21] Milano was

---

**21.** Information concerning what took place during the ride was introduced through the reading of Chester's and Appellant's testimony from the 1988 trial. This included Chester's description that Appellant began

"smacking" Milano while Milano was driving, N.T., May 18, 1988, at 524, albeit Appellant denied that assertion, *see id.* at 548, 580. *See generally* N.T., Feb. 9, 2007, at 92 (reflecting that pages 460–541 and 547–590 of the May

ultimately forced to exit his own vehicle and walk into a wooded area in darkness. Under such circumstances, any contention that the jury was likely to consider as "weak" the aggravating factor that Milano was killed while being kidnapped lacks any foundation in the record.

### Failure to properly object to the questioning of Dr. Dee

■ Appellant's next claim is similar to one that was raised and rejected on direct appeal. It involves a question that the prosecutor asked while cross-examining Dr. Dee during the penalty phase, and defense counsel's objection to that question.

In the penalty-phase, Dr. Dee, as noted, opined that Appellant suffered from an extreme mental or emotional disturbance at the time of the offense. *See* 42 Pa.C.S. § 4711(e)(2). On cross examination, the Commonwealth questioned Dr. Dee about whether he had given a similar opinion in other capital cases. During the questioning, the Commonwealth began describing the facts of those cases, whereupon the court held a sidebar discussion at which it admonished the Commonwealth that it could not question Dr. Dee about the details of other cases, but it could elicit that Dr. Dee had "given the same opinions" regarding other capital defendants. N.T., Feb. 13, 2007, at 82. The court additionally instructed the jury that "your task here is to follow the law as I give it to you with respect to this defendant and these circumstances." *Id.* at 83. When the Commonwealth resumed its cross-examination, it referred to a Florida case in which Dr. Dee had testified, and queried as follows:

Q. Again, your testimony or your opinion was that [the defendant in that matter] suffered from a mental condition that substantially impaired his ability to

18, 1988, trial transcript were read for the

comply with the law. Does that refresh your recollection?

A. Well, that's [the] statutory language in Florida, yeah.

Q. In fact, in that case the court found that your testimony to be [sic] very speculative—

[Defense counsel]: Objection, Your Honor.

THE COURT: Sustained. Members of the jury, again, you will need to follow the standards in this case as to the law. *Id.* at 86. Another sidebar conference was held in which counsel moved for a mistrial on the premise that the Commonwealth had "told the jury that another [c]ourt has found this witness not to be credible," and "it's impossible to unring this bell." *Id.* at 87–88. The court denied the motion but provided an immediate curative instruction, telling the jury:

Dr. Dee has been received as an expert in this case. I gave you instructions earlier in the trial regarding expert testimony but I will later give you instructions regarding the manner in which you are to evaluate his testimony. The sole issue before you today is what the penalty should be for this defendant, and you are only to consider the evidence presented in this case and the law as I give it to you.

*Id.* at 90.

On direct appeal, Appellant maintained that the trial court had erred in denying his mistrial motion because the Commonwealth's suggestion that another court found Dr. Dee's testimony to be "very speculative" constituted prosecutorial misconduct. He also proffered that his rights under the Eighth Amendment and the Due Process Clause were harmed because the Commonwealth placed before the jury in-

jury during the retrial).

formation that he had no opportunity to deny or explain, and the jury was prevented from giving full consideration and effect to all mitigation. This Court denied the claim on its merits insofar as it was based on an allegation of prosecutorial misconduct, and found the claim waived to the extent it was grounded on the Eighth Amendment and the Due Process Clause. In terms of waiver, the Court observed that these constitutional arguments were not raised in Appellant's statement of matters complained of on appeal. *See Laird,* 605 Pa. at 179–81 & n. 27, 988 A.2d at 643–44 & n. 27.

Appellant now suggests that trial counsel was ineffective for failing to base his mistrial motion on the Eighth Amendment and the Due Process Clause (presumably that of the Fourteenth Amendment).[22] He contends that, if counsel had specified these constitutional bases and included them in his statement of matters complained of, they would have been preserved on appeal and this Court would have granted relief instead of finding the claim waived in part.

 The Eighth Amendment requires non-arbitrary, individualized assessment of the appropriateness of the death penalty as to each capital defendant. Therefore, a full consideration of the character and record of the defendant and the circumstances of the offense forms an "indispensable part of the process of inflicting the penalty of death." *Monge v. California,* 524 U.S. 721, 734, 118 S.Ct. 2246, 2253, 141 L.Ed.2d 615 (1998). *See generally Buchanan v. Angelone,* 522 U.S. 269, 276, 118 S.Ct. 757, 761, 139 L.Ed.2d 702 (1998) (observing that, in the selection phase of a capital punishment determination, "we have emphasized the need for a broad inquiry into all relevant mitigating

evidence to allow an individualized determination").

Much of the Supreme Court's jurisprudence in this arena has pertained to whether a trial court's jury instruction had the effect of limiting the jury's ability to consider and give full effect to the defendant's mitigation. *See, e.g., Penry v. Johnson,* 532 U.S. 782, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001) (*"Penry II"*); *Smith v. Texas,* 543 U.S. 37, 125 S.Ct. 400, 160 L.Ed.2d 303 (2004) (*per curiam*). However, the Court has also indicated that the Eighth Amendment prohibits prosecuting attorneys from engaging in conduct which would have a similar effect. For example, the Amendment precludes prosecutors from suggesting to the jury that it does not bear the final responsibility for determining the appropriateness of the accused's death. *See Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) (invalidating a death sentence imposed after the prosecutor told the jury that "your decision is not the final decision" because it "is automatically reviewable by the [state] Supreme Court").

Appellant's argument implicates this latter facet of Eighth Amendment precedent. He does not suggest that the trial court's instructions were faulty in the sense that, by themselves, they precluded the jury from affording complete consideration to his mitigating evidence. Rather, he asserts that the prosecutor's unfinished question, as recited above, prevented the jury from giving full effect to the mitigating evidence offered by that expert. *See* Brief for Appellant at 27 (arguing that the Commonwealth "discouraged the jury from finding the mitigating factors identified by Dr. Dee"). He additionally proffers that the court's curative instruction—as well as

---

**22.** The Eighth Amendment applies to the States through the Fourteenth Amendment. *See Robinson v. California,* 370 U.S. 660, 666, 82 S.Ct. 1417, 1420, 8 L.Ed.2d 758 (1962).

its subsequent more general jury charge regarding expert testimony—did little to remedy the problem. In this regard, Appellant references *DePew v. Anderson*, 311 F.3d 742 (6th Cir.2002), for the principle that the Eighth Amendment is violated when a prosecuting attorney "unfairly undercut[s]" the defendant's mitigation evidence. Brief for Appellant at 26–27.

In *DePew*, the reviewing court found that the prosecutor's conduct did, indeed, limit the jurors' ability to fully consider the defendant's mitigation. The conduct in that matter was described by the court as follows:

> [T]he prosecutor openly declared at a pretrial hearing that he did not care whether [DePew] received fair treatment. Later the prosecutor informed the jury of an alleged knife fight, which was not in evidence, and implied thereby that [DePew] was guilty of wrongdoing, of which there was absolutely no evidence. Further, the prosecutor commented to the jury on a subsequent conviction of [DePew's], unsupported by any evidence in the record, and then after being admonished by the trial judge, who had previously warned against mention of such[,] told the jury that no such conviction existed. The prosecutor then exhibited and commented on a totally irrelevant photograph depicting [DePew] next to a marijuana plant. Further, the prosecutor, in his closing remarks at the penalty stage, told the jury that "[i]t's not necessarily true that if you get three counts of twenty to life that it will add up to sixty—that's not necessarily true." While this does not involve a total misstatement of the law, it certainly could be construed as misleading.

*DePew*, 311 F.3d at 744–45 (citation and some internal brackets omitted) (quoting *State v. DePew*, 38 Ohio St.3d 275, 528 N.E.2d 542, 556 (1988)).

The situation in *DePew*, as described above, is not comparable to the Commonwealth's penalty-phase conduct presently in dispute. The conduct here consisted of a single, partial question suggesting that, in an unrelated case, a court in another jurisdiction found Dr. Dee's testimony "very speculative." The remark was brief and isolated, and subject to a contemporaneous objection, which was sustained. Moreover, no context was given, and thus, although the Commonwealth's question/remark may have been improper, its effect on the jury was necessarily limited. In this respect, we observed on direct appeal that,

> on both direct and cross examination, Dr. Dee described in significant detail the information and reasoning that formed the basis for his conclusions regarding Appellant. Considering all of these circumstances, as we must, we do not believe that the prosecutor's single reference to the Florida case, which was subject to an immediate curative instruction, had the "unavoidable effect" of prejudicing the jurors against him and preventing them from rendering a fair and impartial verdict.

*Laird*, 605 Pa. at 181, 988 A.2d at 644 (citing N.T., Feb. 13, 2007, at 56–78 (direct examination), 90–105 (cross-examination)).

Furthermore, we disagree with the premise that the court's curative charge was ineffectual. In the charge, the Court told the jury that "[t]he sole issue before you today is what the penalty should be for this defendant, and you are *only to consider the evidence presented in this case* and the law as I give it to you." N.T., Feb. 13, 2007, at 90 (emphasis added). By straightforward implication, the jury was instructed to disregard information about other cases. *Accord* Brief for the Com-

monwealth at 55. *See generally Commonwealth v. Stokes,* 576 Pa. 299, 306, 839 A.2d 226, 230 (2003) ("A jury is presumed to follow the court's instructions.").

In contrast to *DePew,* the present matter is substantially akin to *State v. LaMar,* 95 Ohio St.3d 181, 767 N.E.2d 166 (2002). In that matter, the prosecutor's penalty-phase argument included a misstatement of the nature of mitigating circumstances. When defense counsel objected and moved for a mistrial, the trial court sustained the objection, denied the motion, and gave a curative instruction telling the jury to disregard that portion of the prosecutor's argument. Before the jury retired to deliberate, the trial court supplied an accurate definition of mitigating evidence. On federal habeas review, the district court quoted *DePew*'s admonition that, "[w]hen a prosecutor's actions are so egregious that they effectively foreclose the jury's consideration of . . . mitigating evidence, the jury is unable to make a fair, individualized determination as required by the Eighth Amendment." *LaMar v. Ishee,* 2010 WL 5574467, *61 (S.D.Ohio July 30, 2010) (quoting *DePew,* 311 F.3d at 748 (internal quotation marks and citation omitted)), *report and recommendation adopted,* 2011 WL 2555354 (S.D.Ohio June 27, 2011). However, the court expressed that the prosecuting attorney's conduct at LaMar's trial "can hardly be compared to the egregious and inflammatory statements and conduct of the prosecutor in *DePew.*" *Id.* at *62. As noted, we reach a similar conclusion here.

In light of the foregoing, we see no realistic possibility that the trial court would have provided "the extreme remedy of a mistrial," *Commonwealth v. Powell,* 598 Pa. 224, 249, 956 A.2d 406, 421 (2008), or that this Court would have granted such relief on direct appeal, if only penalty-phase counsel had articulated an Eighth–Amendment basis for his objection. *Accord* PCRA Ct. Op. II, *slip op.* at 50 ("Even if trial counsel had . . . cited a different basis for mistrial, it would not have resulted in a different outcome."). *See generally Commonwealth v. Bryant,* 620 Pa. 218, 238, 67 A.3d 716, 728 (2013) ("When the trial court gives adequate cautionary instructions, declaration of a mistrial is not necessary."). That being the case, Appellant's ineffectiveness claim lacks arguable merit to the degree it is founded on the Eighth Amendment.

 As pertains to the due-process basis for this claim, Appellant's specific argument is that the Commonwealth improperly "injected information into the penalty phase . . . that Appellant had no opportunity to deny or explain." Brief for Appellant at 29–30.[23] As precedent, Appellant

---

**23.** It may seem at first that a due process argument was litigated on direct appeal, since a claim of prosecutorial misconduct is often a particularized due process claim based on the right to a fair trial. *See, e.g., Commonwealth v. Watkins,* —— Pa. ——, ——, 108 A.3d 692, 720 (2014). However, prosecutorial misconduct may also be grounded on other asserted violations. *See Commonwealth v. Reid,* —— Pa. ——, ——, 99 A.3d 427, 456 (2014). Here, the prosecutorial-misconduct allegation considered on direct appeal related to the principle that it is improper for prosecutors to express their personal beliefs on questions that are exclusively for the jury, including witness credibility. *See Laird,* 605 Pa. at 179–80, 988 A.2d at 643. Such precept has often been explained by reference to codes of professional responsibility as they relate to the prosecutorial function, rather than by reference to due process as such. *See, e.g., Commonwealth v. Grant,* 479 Pa. 74, 81, 387 A.2d 841, 844 (1978). Hence, we will address the present due process argument on its merits rather than invoking the rule that a new theory cannot be raised during post-conviction proceedings in support of the same ineffectiveness claim that was litigated on direct appeal. *See, e.g., Commonwealth v. Collins,* 585 Pa. 45, 56, 888 A.2d 564, 570 (2005).

references the Opinion Announcing the Judgment of the Court in *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977).

In *Gardner*, a jury recommended a sentence of life imprisonment, but the sentencing judge overrode that recommendation based on a state-issued presentence report that the judge received after the jury was dismissed. Portions of the report were confidential and were never disclosed to the defendant or his attorney. A three-Justice plurality of the Supreme Court concluded that this procedure violated due process because the defendant had no opportunity to deny or explain the information on which the court relied. *See Gardner*, 430 U.S. at 362, 97 S.Ct. at 1207.[24]

Gardner has been summarized as requiring that "a defendant ... have a meaningful opportunity to deny or explain the State's evidence used to procure a death sentence." *Duvall v. Reynolds*, 139 F.3d 768, 797 (10th Cir.1998). Thus, for example, the California Supreme Court has held that a new penalty hearing was warranted where the trial court prevented the defendant from introducing evidence concerning certain strict security measures in place in California state prisons. The defendant sought to introduce these proofs to rebut the prosecution's evidence that the defendant had previously engaged in assaultive behavior and escape attempts while living in a jail setting with more lenient security protocols. After the trial court ruled that the defendant's evi-

dence was inadmissible, the prosecutor suggested in his closing argument that the defendant's antisocial behavior was likely to escalate over time. Additionally, in responding to a jury question, the trial court informed the jurors they could consider as an aggravating factor the possibility of future escapes and/or violent crimes. The reviewing court stated that, although evidence of prison conditions is generally inadmissible during the penalty phase, the defendant's due process rights as articulated in *Gardner* were harmed because the prosecutor introduced evidence which the defendant was prevented from denying or explaining. *See People v. Smith*, 61 Cal.4th 18, 186 Cal.Rptr.3d 550, 584, 347 P.3d 530 (2015).

On the other hand, the Supreme Court has deemed *Gardner* inapplicable where the defendant had an opportunity to rebut or explain evidence, notwithstanding that its introduction surprised the defense. In *Gray v. Netherland*, 518 U.S. 152, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996), for example, the Court rejected a *Gardner* claim where two surprise witnesses testified at the penalty phase and the defendant had an opportunity to cross-examine them. The Court distinguished *Gardner*, characterizing it as "forbid[ding] the use of secret testimony in the penalty proceeding of a capital case which the defendant has had no opportunity to consider or rebut." *Id.* at 164–65, 116 S.Ct. at 2082. In rejecting the claim, the Court reasoned that, in

---

**24.** The *Gardner* majority was highly fractured, and the Supreme Court later described *Gardner*'s actual holding as a narrow one based on the Eighth Amendment. *See O'Dell v. Netherland*, 521 U.S. 151, 162, 117 S.Ct. 1969, 1976, 138 L.Ed.2d 351 (1997). On the other hand, a four-Justice plurality has reaffirmed *Gardner*'s due process component, *see Simmons v. South Carolina*, 512 U.S. 154, 161, 114 S.Ct. 2187, 2192, 129 L.Ed.2d 133 (1994), and, in a different context, a majority

of the Supreme Court has referred to "the elemental due process requirement that a defendant not be sentenced to death 'on the basis of information which he had no opportunity to deny or explain.' " *Skipper v. South Carolina*, 476 U.S. 1, 5, 106 S.Ct. 1669, 1671, 90 L.Ed.2d 1 (1986) (quoting *Gardner*, 430 U.S. at 362, 97 S.Ct. at 1207). Particularly in view of *Skipper*, we conclude that the due process principle articulated by the *Gardner* plurality represents binding precedent.

*Gardner,* the defendant "literally had no opportunity to even see the confidential information, let alone contest it." *Id.* at 168, 116 S.Ct. at 2084. The defendant in *Gray,* on the other hand, "had the opportunity to hear the testimony of [the two surprise witnesses] in open court, and to cross-examine them." *Id.; cf. People v. Sakarias,* 22 Cal.4th 596, 94 Cal.Rptr.2d 17, 995 P.2d 152, 185–86 (2000) (denying relief on a Gardner claim where the sentencing court possessed secret information but did not expressly use it in its sentencing decision).

Even assuming that the prosecutor's partial question constituted "information" for *Gardner* purposes, the present case is materially distinguishable from *Gardner.* First, the question at most constituted witness impeachment rather than substantive evidence in support of the death penalty. As well, the information was not kept secret from the defendant or his attorney. Rather, it was stated in open court and pertained to a prior judicial decision which was a matter of public record. *See Porter v. State,* 788 So.2d 917, 923 (Fla.2001) (quoting *State v. Porter,* No. 85–5546 CFA, order at 4–7 (Fla. 18th Cir.Ct. May 10, 1996)). As such, Appellant could have sought to contest or explain the information, for example, by questioning Dr. Dee on redirect examination. *Cf. State v. Conaway,* 339 N.C. 487, 453 S.E.2d 824, 846 (1995) (rejecting a *Gardner* due process contention based on impeachment evidence because, *inter alia,* the defendant testified at his sentencing hearing and could have addressed the evidence while on the witness stand). Instead, Appellant raised an immediate objection, and he benefitted from a contemporaneous curative instruction designed to eliminate any prejudice to his penalty-phase case stemming from the mention of the Florida decision. As discussed, moreover, the jury is assumed to have followed the instruction, and thus, to

have considered only "the evidence presented in this case." Consequently, this is not a case in which it can be said that Appellant either "had no opportunity to even see the confidential information, let alone contest it," *Gray,* 518 U.S. at 168, 116 S.Ct. at 2084, or otherwise lacked "a meaningful opportunity to deny or explain the State's evidence used to procure a death sentence." *Duvall,* 139 F.3d at 797. That being the case, Appellant's underlying due process argument lacks merit.

### *Failure to object to other-bad-acts evidence*

 Appellant's next argument is based on the fact that all of the guilt-phase evidence was incorporated into the penalty phase. Counsel wanted the incorporation to occur so that the extensive, favorable expert testimony adduced to support his diminished-capacity defense could be considered by the sentencing jury. *See* N.T., May 23, 2012, at 180–81. Appellant maintains, however, that counsel was ineffective for failing to object to the incorporation of some of the guilt-phase evidence: specifically, the testimony that, at the Edgely Inn, Appellant made a sexual remark to Gail Gardener and gave alcohol to Barbara Parr's son. Appellant views these proofs as irrelevant to a capital penalty hearing because they do not implicate a statutory aggravator. He indicates, in this regard, that the effect of counsel's omission was to allow the jury to consider non-statutory aggravation, particularly inasmuch as the trial court did not issue a cautionary instruction in the penalty phase admonishing the jury against considering other-bad-acts evidence in its sentencing decision. Appellant suggests that, to make matters worse, the prosecutor affirmatively encouraged the jury to rely on such evidence in her closing argument, when she told the jury that

the final, the catchall [mitigating circumstance], is any other evidence of mitigation concerning the character and the record of the defendant and the circumstances of his offense. Well, you already know a lot about [Appellant's] character, I submit to you. You already know a lot about the circumstances of the offense.

N.T., Feb. 13, 2007, at 124. Appellant suggests that the statement, "you already know a lot about [Appellant's] character," was a veiled reference to the other-bad-acts testimony.

On review, we disagree with the suggestion. In the penalty phase, the prosecutor did not discuss the testimony concerning the remark to Gardener or the alcohol given to Parr's son, and she never mentioned these items in her argument to the jury. Rather, the prosecutor concentrated her remarks on the circumstances surrounding the killing itself, namely, the kidnapping and alleged torture of Milano. *See* N.T., Feb. 12, 2007, at 15–16 (opening statement); N.T., Feb. 13, 2007, at 126–34 (summation). She also expressed to the jurors that their sentencing decision should not be based on their "feelings," but on "objective standards under the law" as applied to the underlying facts. N.T., Feb. 13, 2007, at 117. Moreover, any contention that the prosecutor, in the above-quoted portion of her summation, sought to invite the jury to consider non-statutory aggravation is based on speculation.

Additionally, we have already observed that the evidence about which Appellant presently complains was isolated and minor within the context of a five-day murder trial, particularly when compared to the other conduct to which Appellant stipulated—most notably, that he had participated in a brutal murder and that he had

been convicted of kidnapping the victim. Based on this information, moreover, the jury could also infer that Appellant perjured himself at his first trial in which he testified that he had not participated in the murder and sought to shift exclusive blame onto Chester. *See* N.T., May 18, 1988, at 548, 564, 579.[25]

Finally, it bears noting that, through the verdict slip and accompanying instructions from the bench, the trial court channeled the jury's consideration of aggravating circumstances into the two discrete aggravators alleged by the Commonwealth. *See, e.g.,* N.T., Feb. 13, 2007, at 171. Indeed, there is nothing in the record suggesting the jury was told it could consider aggravating evidence untethered to one of these two factors.

In view of the foregoing, the implicit inclusion of the limited other-bad-acts testimony within the overall incorporation of guilt phase evidence into the penalty hearing does not undermine our confidence in the sentencing verdict. *Cf. Commonwealth v. Hutchinson,* 571 Pa. 45, 55, 811 A.2d 556, 562 (2002) (in the context of an ineffectiveness claim raised on direct review, finding no prejudice where counsel failed to object to isolated and passing testimony about other bad acts).

### *Failure to object to argument and instructions regarding mitigation*

██ Next, Appellant contends that counsel were ineffective for failing to object to the Commonwealth's argument, and the trial court's instructions, concerning the definition of mitigating circumstances. Appellant references several places in the prosecutor's summation where she indicated that mitigating evidence is that which makes the "case" or the "killing" less terrible. He also observes that, in the intro-

**25.** This denial and blame-shifting testimony was read to the jury.

ductory portion of its jury charge, the trial court stated that aggravating and mitigating circumstances are "things that make a first degree murder case either more terrible or less terrible." N.T., Feb. 13, 2007, at 164. Appellant argues that such descriptions focus on the crime and not the person who committed it.[26] In this way, Appellant maintains, these types of explanations fail to implement the Supreme Court's Eighth–Amendment directive that a capital sentencer "treat[ ] the defendant as a uniquely individual human being" and that the sentence itself "reflect[ ] a reasoned moral response to the defendant's background, character, and crime." *Penry I*, 492 U.S. at 319, 109 S.Ct. at 2947 (internal quotation marks, citations, and brackets omitted); *see* Brief for Appellant at 37. Appellant acknowledges that this Court has previously rejected similar challenges to this type of instruction, but he maintains that relief is presently warranted because the prosecutor repeatedly used the term "case" or "killing" during her summation. Appellant contends, therefore, that the present dispute is distinguishable from others in which the same definition of mitigating circumstances was upheld. *See* Brief for Appellant at 38.

On direct review, this Court observed that we have consistently rejected similar challenges to the same instruction. *See Laird*, 605 Pa. at 183, 988 A.2d at 645 (citing *Commonwealth v. King*, 554 Pa. 331, 364, 721 A.2d 763, 779–80 (1998); *Commonwealth v. Saranchak*, 544 Pa. 158,

175–76, 675 A.2d 268, 276–77 (1996)). In *Commonwealth v. Washington*, 592 Pa. 698, 927 A.2d 586 (2007), for example, the instruction was used and the same essential argument was made on appeal. This Court reasoned that:

> The trial court is allowed considerable discretion in phrasing instructions as long as they adequately convey the law. In fact, Pennsylvania Standard Criminal Jury Instruction 15.2502F(1) describes aggravating and mitigating circumstances as "things that make a first-degree murder case either more terrible or else less terrible." Additionally, we have rejected the claim Appellant now advances, declining to find that the trial court instructions
>
>> as a whole, interfered with the jury's evaluation of the specific mitigation evidence presented by Appellant or their assessment of his personal moral culpability. These instructions merely expressed to the jury, in laymen's terms, the purpose for the distinction between aggravating and mitigating circumstances in a capital penalty phase.

*Id.* at 745, 927 A.2d at 613–14 (quoting *Commonwealth v. Johnson*, 572 Pa. 283, 325, 815 A.2d 563, 588 (2002), in turn quoting *Commonwealth v. Stevens*, 559 Pa. 171, 207 739 A.2d 507, 526–27 (1999)).[27]

When we consider the trial court's charge "as a whole," as we must, *see Com-*

**26.** Appellant quotes selected excerpts from a law dictionary for the position that "case" means event, happening, situation, or circumstances. He argues that, as such, "case" is an inappropriate term for defining mitigation. *See* Brief for Appellant at 38.

**27.** Contrary to Appellant's suggestion, *see supra* note 26, the phraseology pertaining to making a first-degree murder "case" less terrible, as understood in lay terms, is proper inasmuch as it subsumes the broad category

of circumstances included within the statutory definition of mitigation (including the "catchall" circumstance). Indeed, by Appellant's own account the term includes the attending "circumstances" and "situation," both of which, we believe, jurors will understand to encompass more than the crime itself—particularly where, as here, the general definition is followed by instructions as to particular mitigators.

*monwealth v. Hawkins,* 567 Pa. 310, 338, 787 A.2d 292, 308 (2001), we reach the same conclusion here. As in *Washington,* the jury charge tracked the standard instruction pertaining to the definition of aggravating and mitigating circumstances. Significantly, as well, the specific mitigating circumstances relating to Appellant's life history and personal character (such as good conduct in prison) were enumerated on the verdict slip. After charging the jurors with regard to certain mitigating factors, the court issued a separate instruction concerning the "catchall" factors, stating:

> The [Pennsylvania] legislature ... provides that you are to consider any other evidence of mitigation concerning the character and record of the defendant and the circumstances of the defendant's offense. And I have listed there [on the verdict slip], for your consideration, all of the mitigating factors that have been presented for your consideration under this subsection. They include physical abuse, sexual abuse, emotional abuse, witness the abuse of others, psychological consequences of abuse. Substance abuse, alcohol abuse, conduct in prison. And during this trial the defendant stipulated to the fact that he participated in the murder.

N.T., Feb. 13, 2007, at 173. After a brief sidebar discussion, the court reiterated its admonition that the jury should consider all of the listed mitigating circumstances, clarifying that each was to be evaluated separately. *See id.* at 175.

Inasmuch as these repeated instructions were proper, and considering that all of

the proposed life-history and character-based mitigation was listed on the verdict slip which the jurors took with them during deliberations, it is speculative to argue that the prosecutor's earlier description of mitigation, couched in terms of whether a "case" or a "killing" was rendered less terrible, interfered with the jury's ability to carry out its Eighth Amendment duties, notwithstanding that the prosecutor may have reiterated this description several times.[28] Moreover, the record contradicts Appellant's argument since one or more jurors expressly found all of the proffered character and life-history mitigation. *See supra* note 16 and accompanying text. Accordingly, Appellant's underlying claim lacks arguable merit and, as such, he cannot obtain relief on his ineffectiveness contention.

### *Failure to object to victim impact evidence*

 In his last penalty-phase claim, Appellant asserts that the jury's sentencing decision was tainted by improper victim impact testimony that was introduced in the guilt phase and, as such, was included within the incorporation of evidence into the sentencing phase.[29] Appellant recognizes, in this regard, that the 1995 legislative change which allowed victim impact evidence to be presented in a capital penalty hearing, *see* 42 Pa.C.S. § 9711(a)(2), does not apply to sentences imposed for offenses, such as the present one, which occurred before its effective date, *see Commonwealth v. Duffey,* 585 Pa. 493, 516, 889 A.2d 56, 70 (2005), and that the pre–1995 version of Section 9711(a)(2) has been interpreted to preclude the intro-

---

**28.** Although Appellant is correct that counsel did not object during the prosecutor's summation, counsel did observe in his responsive argument to the jury that the prosecutor's description was incomplete, that mitigating factors are legislatively defined, and that the

court would provide definitive instructions on the matter before the jury retired to deliberate. *See* N.T., Feb. 13, 2007, at 145.

**29.** Appellant does not allege that any such evidence was adduced in the penalty phase.

duction of such testimony, *see Commonwealth v. Fisher*, 545 Pa. 233, 266, 681 A.2d 130, 146 (1996).[30] He notes that a similar claim was deemed waived on direct appeal due to trial counsel's failure to object to the evidence in question. *See Laird*, 605 Pa. at 181–83, 988 A.2d at 644–45. Thus, Appellant now adds an ineffectiveness overlay based on such omission, citing in particular the failure to object to the incorporation of any guilt-phase victim impact evidence into the penalty phase. *See* Brief for Appellant at 45. He observes that, in view of the governing legal framework as mentioned above, counsel obtained a pretrial ruling that victim impact evidence would be excluded from the penalty hearing. Hence, he argues, such an objection would have been sustained.

The evidence Appellant claims was improper consists of testimony from three guilt-phase witnesses. First, Vito Milano, Anthony's father, testified that: he lived with his wife and Anthony in 1987, but now his wife was deceased and so he lives alone; at the time of his death Anthony was 26 years old and had recently graduated from art school with honors; on the night of the murder, Anthony said goodnight to his parents, stating he had to go out for a while; and he (Vito) never saw his son again. Second, Orpha Newswanger, who knew Anthony Milano from church, stated that: Anthony sometimes attended Bible studies in her home, and they were completing lessons on learning to become a servant; Anthony visited her during the evening in question and the two listened to a tape pertaining to peacemaking and read several associated scriptures; and she never saw him again. Finally, Melanie Ozdemir—who identified the victim's car, as well as an ornament that hung from the rearview mirror, which was later in Appellant's possession—testified that Anthony Milano was a good friend of hers and she had known him since 1979 when the two were in high school together.

In addition to the above, Appellant urges that the prosecutor "continued the victim impact theme in her closing argument at both phases." Brief for Appellant at 43. In particular, Appellant states that in the guilt phase, the prosecutor concluded her summation by contrasting what she termed as Appellant's "world" in which Anthony Milano was less than human, with "our world" in which he was a beloved son and brother. N.T., Feb. 9, 2007, at 57–58. In her penalty-phase summation, more-

---

**30.** Victim impact evidence is designed to show the victim's "uniqueness as an individual human being." *Payne v. Tennessee*, 501 U.S. 808, 823, 111 S.Ct. 2597, 2607, 115 L.Ed.2d 720 (1991) (internal quotation marks omitted). Such evidence includes information about the victim and the impact of the victim's death on his or her family which is not otherwise relevant to the proceeding. *See Commonwealth v. Rios*, 591 Pa. 583, 612–13, 920 A.2d 790, 807 (2007), *overruled on other grounds*, *Commonwealth v. Tharp*, —— Pa. ——, 101 A.3d 736 (2014).

In June 1987, the United States Supreme Court ruled that the Eighth Amendment bars admission of victim impact evidence during the penalty phase because such evidence is unrelated to the defendant's blameworthiness. *See Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). *Booth* was overruled four years later in *Payne*, where the Court determined, *inter alia*, that the amount of harm caused by the defendant is relevant to his blameworthiness and, as such, to an assessment of the appropriate sentence. *See Payne*, 501 U.S. at 819, 111 S.Ct. at 2605; *cf. id.* at 825, 111 S.Ct. at 2608 (reasoning that, just as the defendant is entitled to remind the sentencer he is a unique individual, so too the prosecution should be permitted (if a state statute allows it) to remind the jury that "the victim is an individual whose death represents a unique loss to society and in particular to his family" (internal quotation marks and citation omitted)). In light of *Duffey* and *Fisher*, however, *Payne*'s holding has no application to this case.

over, the prosecutor · expressed that the victim's family "had to sit here again and listen to what happened to their son in that [sic] dark, cold woods." N.T. Feb. 13, 2007, at 125. Later, she indicated that, for purposes of the torture aggravator, what mattered was how the killing was accomplished rather than the fact of the killing itself, in which Milano's "life filled with promise and future" was taken from him. *Id.* at 129. Finally, the prosecutor remarked on "[t]he inability [of the victim] to go home that night to his family." *Id.* at 134.

The Commonwealth responds that the challenged guilt-phase information was either permissible life-in-being testimony (*i.e.,* evidence that the victim was alive prior to the time of the alleged murder) or relevant to the narrative of events leading up to the offense. The Commonwealth adds that, although some of the information, such as that provided by Vito Milano, may have seemed unfortunate, this alone does not convert it into victim impact testimony.

In *Commonwealth v. McNeil,* 545 Pa. 42, 679 A.2d 1253 (1996), as in the present case, victim impact evidence was precluded. This Court sustained an ineffectiveness claim where counsel failed to object to penalty-phase testimony by the victim's aunt stating that the victim was gracious, kind, and generous, and had particular concern for the underdog and the elderly. Such testimony clearly pertained only to the victim's personal qualities and had no other relevance to the sentencing proceeding. Since it was impossible to determine how the jury might have considered the testimony while weighing the aggravating and mitigating factors, the Court remanded for a new sentencing hearing. *See id.* at 55–56, 679 A.2d at 1259.

On the other hand, "a criminal defendant does not have the right to have all evidence presented against him at trial sanitized of anything that could cause jurors to sympathize with the victim or his family." *Commonwealth v. Rios,* 591 Pa. 583, 612–13, 920 A.2d 790, 807 (2007), *overruled on other grounds, Commonwealth v. Tharp,* —— Pa. ——, 101 A.3d 736 (2014). Thus, in *Commonwealth v. Bardo,* —— Pa. ——, 105 A.3d 678 (2014) (*per curiam*), the mother of the infant murder victim testified that, after searching for her child throughout the night, she was at a store when another woman came through the door yelling that the missing baby had just been found in a creek wrapped in a garbage bag. This Court concluded that the testimony was not victim impact evidence since it did not concern the victim or the impact of the victim's death on her family. Rather, it was deemed to be "part of the chronology of the crime charged in this case." *See id.* at ——, 105 A.3d at 715 (internal quotation marks omitted).

Additionally, as the Commonwealth observes, life-in-being testimony is not victim impact testimony, and hence, is not subject to the pre–1995 restriction. *See, e.g., Commonwealth v. Carson,* 590 Pa. 501, 531–32, 913 A.2d 220, 237 (2006) (holding that the victim's mother did not provide victim impact evidence by testifying that: before the crime occurred her son was alive and well; the next time she saw him he was dead; and she identified his body at the medical examiner's office). Finally, the category of victim impact evidence has been held to exclude generalized background information concerning the victim (including the fact that the victim graduated from a particular school) as well as brief comments suggesting that the victim's family was concerned when they had not heard from the victim and did not know his whereabouts. *See Commonwealth v. Miller,* 560 Pa. 500, 519, 746 A.2d

592, 602 (2000) (describing such information as "matter of fact").

Here, most of the complained-of evidence either falls into this latter category or did not purport to describe Anthony Milano's personal qualities or the impact of his death upon his family. The fact that Anthony Milano was 26 and had graduated from art school constituted general background information, as did the evidence that Ms. Newswanger knew him from church. Vito Milano's testimony that he lives alone was also background information that cannot be viewed as victim impact evidence except via conjecture, since there is no record basis to believe Anthony, had he still been alive, would have been living with him in 2007. Moreover, the fact that Anthony was seen at his parents' house and at Ms. Newswanger's residence on night in question constitutes permissible chronology-of-events evidence. Further, Melanie Ozdemir's statement that she was a good friend of the victim's and had known him since high school helped lay the foundation for her ability to identify his car and the glass ornament that was in Appellant's possession in the post-killing timeframe.

The evidence that Anthony Milano had listened to a tape and read Bible passages relating to peacemaking when he was at Orpha Newswanger's house on December 14, 1987, comes closest to straying beyond what was permissible for ordinary evidentiary purposes. In all events, the PCRA court credited penalty-phase counsel's "strategic decision to limit the jury's exposure to unfavorable evidence" by omitting any particularized objection to such evidence at the time of the general incorporation of guilt-phase evidence into the penalty phase. PCRA Ct. Op. II, *slip op.* at 58. As well, the testimony along these lines was quite brief—

consisting of two short questions and answers—and it was adduced on the opening day of a trial in which the jury began deliberating on the sentence eight days later. Accordingly, even if we assume that Orpha Newswanger's testimony in this respect was improperly admitted, it was, within the proceeding as a whole, *de minimus* and insufficient to undermine our confidence in the outcome of the sentencing hearing.

As for the prosecutor's guilt-phase summation, we note initially that it was not evidence. *See Commonwealth v. Philistin,* 617 Pa. 358, 381, 53 A.3d 1, 14 (2012) ("[T]he Commonwealth's closing argument was not victim impact evidence, as 'the arguments of counsel are not evidence.'" (quoting *Commonwealth v. Ligons,* 565 Pa. 417, 773 A.2d 1231, 1238 (2001))).[31] Thus, it was not incorporated into the penalty phase. Accordingly, to the degree Appellant's complaint rests on the premise he was harmed by spillover prejudice from the district attorney's guilt-phase summation, such contention is inapplicable to the issue of whether counsel should have objected to the incorporation of portions of the guilt-phase evidence.

 Insofar as the issue may be viewed broadly to subsume counsel's failure to voice a contemporaneous objection to the prosecutor's summation, we note that, under this Court's case precedent, prosecuting attorneys have leeway to "present [their] arguments with logical force and vigor," *Commonwealth v. Cox,* 556 Pa. 368, 385, 728 A.2d 923, 931 (1999) (internal quotation marks omitted), and they are permitted a degree of oratorical flair in advocating the Commonwealth's case, *see Commonwealth v. Keaton,* 556 Pa. 442, 463, 729 A.2d 529, 540 (1999). Here, the prosecutor's brief references to

---

**31.** The trial court instructed the jury to this effect. *See* N.T., Feb. 9, 2007, at 62.

the victim being a "beloved son" to his father and "still a friend and a brother" to his sister, N.T., Feb. 9, 2007, at 58, did not, as in *McNeil,* amount to specific information about Anthony Milano's character, personal qualities, or "uniqueness as a human being," *Payne,* 501 U.S. at 823, 111 S.Ct. at 2607; *see Commonwealth v. Bomar,* 573 Pa. 426, 458, 826 A.2d 831, 850 (2003), nor did they describe the impact of his death upon his family. Rather, they articulated that the victim was loved by his father and sister. In this regard, our Court has explained that, "[w]hile reference to irrelevant matters should be avoided, ... murder victims are not simply props or irrelevancies in a murder prosecution, and innocuous references to victims and their families are not necessarily prejudicial." *Commonwealth v. Freeman,* 573 Pa. 532, 582, 827 A.2d 385, 415 (2003). We conclude that, consistent with the precepts contained in decisions such as *Cox* and *Bomar,* the prosecutor's brief references to Anthony Milano's father and sister fell within the boundaries of permissible advocacy and did not constitute improper victim impact argumentation or other misconduct so as to obligate counsel to object.

As for the Commonwealth's penalty-phase summation, we observe initially, and in addition to the principles already mentioned, that a prosecutor's comments must be evaluated in the context in which they were made, *see Commonwealth v. Hall,* 549 Pa. 269, 285, 701 A.2d 190, 198 (1997), and a prosecutor may urge the jury to view the defense's mitigation evidence with disfavor. *See Stokes,* 576 Pa. at 311, 839 A.2d at 233; *accord Commonwealth v. Watkins,* —— Pa. ——, ——, 108 A.3d 692, 720 (2014) (*per curiam* ). These precepts are relevant to the first aspect of the Commonwealth's penalty-phase summation that Appellant challenges, which occurred when the prosecutor indicated that Anthony Milano's father and sister had to sit through another trial and hear what happened to him. The prosecutor stated:

> The final [proposed mitigating circumstance] is that during this trial the defendant stipulated to the fact that he participated in the murder. Well, ladies and gentlemen, I submit to you that is not a valid mitigating circumstance. We all went through last week [*i.e.,* the guilt phase] together. We all sat here and we had to bring witnesses in. Witnesses that did not want to be here. Witnesses that had put this behind them. Witnesses that had to come in here and they changed their lives, many of them, and recounted that day back in December, 1987. And the Milanos had to sit here again and listen to what happened to their son in that [sic] dark, cold woods. And the defense attorneys came up here and what they said to you is find Richard Laird not guilty. It's not an admission. That's not mitigation.

N.T., Feb. 13, 2007, at 125. The single sentence which Appellant now highlights, when viewed in context, was part of the Commonwealth's argument for why the stipulation should not be considered mitigating. Appellant does not cite any authority, moreover, suggesting that observing or participating in the trial of the accused constitutes victim impact, and our research does not reveal any. Thus, we conclude that the prosecutor's comment was not improper.

Another portion of the summation to which Appellant objects pertains to the prosecutor's argument that the jury should find the torture aggravator:

> Aggravating factor number 2 is not the fact that they killed Anthony Milano, not the fact that he killed him and took his life away, took a life filled with promise and future away from him; that's not it. It's the way that it was done. It's the

horrifying circumstances under which Anthony Milano died. That is the second aggravating factor because this killing was done by means of torture.

N.T., Feb. 13, 2007, at 129. We acknowledge that the prosecutor could have advocated in favor of the torture aggravator without adding that the victim's life was "filled with promise and future." However, an expression along these lines is generalized and, again, under this Court's cases, it fits within the latitude afforded to a district attorney in making her arguments.

Finally, Appellant takes issue with the concluding paragraph of the prosecutor's summation, in which she indicated:

Ladies and gentlemen, for what the law requires, for what the evidence says, for the taking of another life in the most heinous of ways, and for what Anthony Milano endured. The inability to go home that night to his family, the safety, the terror, the pain, the struggle, the cruelty, for all those things, ladies and gentlemen, I ask you to uphold your oath, follow the law and return the only just verdict in this case ... death.

N.T., Feb. 13, 2007, at 134 (ellipsis in original). Appellant criticizes the reference to the victim's inability to go home to his family. Again, however, this is generalized and it is obvious that all murder victims cannot to go home to their family. Thus, any contention that this constituted improper victim impact argumentation is meritless.

*Cumulative effect of alleged errors*

Finally, Appellant argues that he is entitled to relief predicated on the cumulative effect of counsel's alleged deficiencies. However, virtually all of Appellant's ineffectiveness contentions fail due to a lack of arguable merit to the underlying claim. To the extent any have been disposed of

based on the absence of sufficient prejudice to undermine confidence in the outcome, we are satisfied that prejudice is lacking on a collective basis as well.

The order of the PCRA court is affirmed.

Justices EAKIN, BAER, TODD, and STEVENS join the opinion.